USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________

No. 98-1966

 DOWN EAST ENERGY CORP.,
 Plaintiff, Appellee,

 v.

 NIAGARA FIRE INSURANCE CO.,
 Defendant, Appellant.

 ____________________

 
No. 98-1967

 DOWN EAST ENERGY CORP.,
 Plaintiff, Appellant,

 v.

 NIAGARA FIRE INSURANCE CO., ET AL.,
 Defendants, Appellees.

 ____________________

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. D. Brock Hornby, U.S. District Judge]

 ____________________

 Before

 Torruella, Chief Judge,
 Bownes, Senior Circuit Judge,
 and Lynch, Circuit Judge.

 _____________________

 Robert M. Kaplan, with whom Miller Christerson McNaboe &
Cortner, was on brief, for appellant Niagara Fire Insurance Co.
 John M.R. Paterson, with whom James A. Clifford and Bernstein,
Shur, Sawyer & Nelson, were on brief, for appellee Down East Energy
Corp.

 ____________________

 April 16, 1999
 ____________________ TORRUELLA, Chief Judge. The underlying dispute in this
case arises out of a series of pollution liability insurance
policies issued to plaintiff-appellee Down East Energy Corporation
("Down East") by defendant-appellant Niagara Fire Insurance Company
("Niagara").
 Down East and its sister company, Brunswick Coal & Lumber
("BC&L"), were in the business of selling gasoline and home heating
oil. As part of this business, Down East owned the Jordan Bay
Mobil gas station located in Raymond, Maine. In 1983, Down East
and BC&L each purchased a comprehensive insurance policy for their
various businesses through the Morse, Payson & Noyes Insurance
Agency. Although the policies were issued by The Continental
Insurance Company, both contained a contemporaneous amendment
naming Niagara as the actual insuring company. Both policies
included insurance against pollution liability. Specifically, the
policies provided $500,000 of pollution liability coverage for: (1)
third-party damage claims, and (2) government ordered cleanups of
leaks and spills from gasoline stations. The 1983 policies became
effective on June 15, 1983 and terminated on June 15, 1986.
 In 1985, while the 1983 policies were still in effect,
Niagara issued a new single policy to BC&L to replace the two 1983
policies. Although the 1985 policy was issued to BC&L, Down East
was named as an additional insured and thus was covered by that
policy. The 1985 policy continued to provide $500,000 of pollution
liability coverage for third-party damage claims and government
ordered cleanups. The 1985 policy became effective June 15, 1985
and terminated on June 15, 1986.
 In 1986, Down East renewed the 1985 policy to run through
June 15, 1987. Again, the renewal policy provided $500,000 of
pollution liability coverage for third-party damage claims and
government ordered cleanups.
 In late 1986, while the policy was still in effect, new
governmental regulations increased the required amount of pollution
liability coverage to $1,000,000. Because the 1986 policy only
provided $500,000 of coverage, Down East needed to find additional
coverage. On October 9, 1986, Alan Quinlan, an insurance agent for
Morse, Payson & Noyes, submitted a written proposal to Down East
outlining Down East's various options. Quinlan proposed two basic
options: (1) purchasing an additional policy for $500,000, or (2)
canceling the 1986 policy issued by Niagara and purchasing an
entirely new policy for $1,000,000. Based on Quinlan's
recommendation, Down East selected the latter option, purchasing a
new $1,000,000 policy from International Surplus Lines Insurance
Company ("ISLIC"), and canceling its 1986 Niagara policy.
 Down East's 1986 Niagara policy was canceled effective
December 23, 1986. Its new ISLIC coverage became effective on the
same date. Under both of these policies, Down East was covered for
claims made during the policy period as a result of pollution
incidents which also occurred during the policy period. Therefore,
if a claim was made on December 24, 1986 against Down East for a
pollution incident that occurred on December 22, 1986, Down East
would have no insurance coverage. The 1986 Niagara policy would
not provide coverage because the claim was made after cancellation
of the Niagara policy, and the ISLIC policy would not provide
coverage because the pollution incident occurred before the
effective date of the ISLIC policy. To avoid this gap in coverage,
Quinlan recommended that Down East purchase an "Extended Reporting
Period Endorsement" from Niagara to extend the reporting period for
claims made against Down East for any pollution incidents that may
have occurred during the original Niagara policy period. In
recommending the purchase of the endorsement to Down East, Quinlan
wrote in a letter dated October 9, 1986:
 This option, at a cost of 50% of the annual
 premium, will cause the [Niagara] policy to
 respond to claims which are made within the
 next twelve months, provided that the incident
 which led to the claim occurred during the
 policy period. This option, if exercised,
 allows for a transition from one claims-made
 policy to another with no gap in coverage,
 provided that all claims for past pollution
 incidents are brought within one year. 
 (Emphasis added).

At the time, Down East understood that coverage under the
endorsement would be co-extensive with coverage under the original
Niagara policy. In other words, Down East understood that the
endorsement extended the reporting period for both third-party
damage claims and government ordered cleanups. By its terms,
however, the endorsement only extended the reporting period for
claims made for property damage and bodily injury, and did not
extend the reporting period for claims made as a result of
government ordered cleanups.
 In September 1987, after the 1986 Niagara policy was
canceled but while the extended reporting endorsement was still in
effect, Down East received notice from the Maine Department of
Environmental Protection ("DEP") that a third-party damage claim
had been filed against Down East. The claim alleged that a
gasoline leak from the Jordan Bay gas station had contaminated a
neighboring well. Immediately upon receipt of the DEP notice,
Down East informed Morse, Payson & Noyes of the damage claim. 
However, Morse, Payson & Noyes did not inform Niagara of the claim
until March 1988, after the extended reporting endorsement had
expired.
 On March 29, 1989, Niagara denied coverage for the third-
party damage claim on the ground that the loss was not reported to
Niagara until March 2, 1988 -- after the expiration of all the
policies issued to Down East by Niagara. Notwithstanding this
denial, in the fall of 1989, Down East initiated a comprehensive
cleanup program to remove gasoline from the ground and groundwater
on the neighboring property. The total amount spent on the cleanup
exceeded $500,000.
 In December 1989, despite its original denial of
coverage, Niagara began to reimburse Down East for the costs
incurred in the cleanup. In a January 17, 1992 letter, Niagara
reversed its earlier position that Down East's claim was not timely
reported to Niagara, and concluded that the costs incurred by Down
East as a result of environmental damage to the neighboring
property were covered. Despite this acknowledgment of coverage,
Niagara stopped making reimbursement payments to Down East in
December 1992. Nevertheless, Down East continued its remediation
efforts.
 In December 1995, Niagara again denied coverage. In its
denial letter, Niagara reasserted its defense that Down East's
claim was untimely in that it was presented to Niagara after the
expiration of the extended reporting endorsement. Niagara also
raised several other grounds for denial which are not relevant to
this appeal. In May 1997, Down East filed this suit.
 Down East's amended complaint asserted the following
grounds for relief: (1) breach of contract; (2) estoppel to deny
coverage; (3) breach of the implied covenant of good faith and fair
dealing; (4) failure to comply with various state statutory
obligations to pay or deny insurance claims in a timely manner; and
(5) estoppel by agency, based on the representations made by Morse,
Payson & Noyes.
 On November 5, 1997, Niagara moved for summary judgment,
which Down East opposed. In its summary judgment motion, Niagara,
for the first time, asserted a new ground for denial of Down East's
claim, namely, that the extended reporting endorsement did not
extend the reporting deadline for initiation of government action.
 On December 19, 1997, a magistrate judge recommended
summary judgment with respect to Down East's claims of breach of
contract, estoppel to deny coverage based on defendants' own
conduct, and breach of an implied covenant of good faith and fair
dealing. On February 20, 1998, the district court adopted the
recommendation of the magistrate, leaving only two causes of action
open for trial: (1) estoppel based on agency, and (2) failure to
comply with various state insurance statutes.
 Trial commenced on July 7, 1998. After the jury retired
to deliberate, but before it reached its verdict, Down East
voluntarily dismissed its state statutory causes of action. On
July 8, the jury returned a verdict in favor of Down East on its
estoppel based on agency claim in the amount of $362,996, the
policy limit less the amount Niagara actually paid. Judgment was
entered in favor of Down East on July 15, 1998. This appeal
followed.
 Niagara raises three issues on appeal. First, Niagara
argues that the district court abused its discretion by denying
Niagara's request to reopen discovery less than three weeks before
the trial date and nearly eight months after the close of
discovery. Next, Niagara contends that Down East's estoppel claim
is time-barred. Finally, Niagara challenges the sufficiency of the
evidence. We address each of Niagara's contentions in turn.
II. Discussion
 A. Denial of Discovery
 Niagara first contends that the district court abused its
discretion in allowing Down East to amend its theory of the case on
the eve of trial without also allowing Niagara to conduct
additional discovery. We disagree.
 First, we agree with the district judge that there was no
"last-minute amendment" of Down East's theory of the case. As
early as the amended complaint, Down East clearly set forth the
factual predicate for the estoppel by agency claim it pursued at
trial. Specifically, the amended complaint alleged that: (1) from
1983 through and including 1987, Niagara issued to Down East
certain pollution liability insurance policies; (2) Down East
procured these insurance policies through Morse, Payson & Noyes,
who acted as an agent for Niagara; (3) Morse, Payson & Noyes, as an
agent of Niagara, was aware of the risks for which Down East sought
coverage and represented to Down East that such coverage had been
obtained; (4) Down East reasonably believed that it obtained the
coverage it requested and relied on this assumption to its
detriment; and (5) Niagara is now estopped to deny coverage. We do
not read these allegations as limiting Down East's estoppel claim
solely to circumstances surrounding the issuance of the principal
insurance policies and not including circumstances surrounding the
issuance of the endorsement. See Conley v. Gibson, 355 U.S. 41,
47-48 (1957) (all that is required of a complaint is "notice
pleading," "a short and plain statement of the claim that will give
defendant a fair notice of what the plaintiff's claim is and the
grounds upon which it rests"). The endorsement itself states,
among other things: "[t]his endorsement forms a part of the above-
numbered policy and applies as of the effective time and date
stated below." The above-numbered policy referenced on the
endorsement is Policy CBP 55423 -- the policy issued to Down East
by Niagara in 1986. Thus, the issuance of the endorsement is
clearly alleged in the amended complaint.
 We also disagree with Niagara's contention that Down
East's answers to interrogatories similarly limited its estoppel
theory to circumstances surrounding the issuance of the principal
insurance policies. While it is true that Down East's answers did
not specifically mention the endorsement or identify Quinlan as one
of the Morse agents who made certain representations to Down East,
we conclude that both the general factual allegations in the
amended complaint as well as the interrogatory answers put Niagara
on fair notice of Down East's estoppel by agency theory.
 In its reply brief, Niagara claims that, on appeal, Down
East raises an entirely new argument that was never presented in
the district court in support of its "last-minute amendment." We
do not agree with Niagara's characterization of Down East's
appellate argument. In its appellate brief, Down East reiterates
the argument it presented in the district court: namely, that its
estoppel by agency theory was part of the case from the inception
of this litigation. Down East refers to Niagara's "new" defense
only to rebut Niagara's claims of unfair surprise and prejudice. 
Specifically, Down East argues that its general estoppel by agency
theory was in the case from the very beginning but that it did not
focus specifically and exclusively on the circumstances surrounding
the issuance of the endorsement until Niagara first asserted the
endorsement defense in its motion for summary judgment. As soon as
Niagara asserted this "new" endorsement defense, Down East merely
narrowed the focus of its more general estoppel theory to the
issuance of the particular endorsement. Because the narrowing of
its estoppel theory was precipitated by the same narrowing of
Niagara's defense theory, Niagara cannot complain of unfair
surprise or prejudice.
 Indeed, even if we were to read the amended complaint and
answers to interrogatories as narrowly as Niagara would have us
read them, our review of Down East's opposition to summary judgment
severely undermines Niagara's claims of unfair surprise. Down
East's opposition states:
 When Down East met with Morse, Payson &
 Noyes in 1985, just as it had done every other
 year, it explained that it wanted to have
 insurance to cover any liability it might
 incur for pollution caused by the operation of
 its gasoline stations, including any cleanup
 costs. Down East understood that the
 insurance provided by Niagara policies No. CBP
 55253, 55246, 55343, and 55423 all provided
 that coverage and was never advised by Morse
 Payson & Noyes that the coverage was other
 than as had been requested by Down East.

 Down East canceled Policy No. CBP 55423
 effective December 23, 1986, and
 simultaneously purchased an Extended Reporting
 Endorsement on that policy running to
 December 23, 1987. It canceled the policy
 because it needed a pollution liability policy
 with higher coverage limits.

 At the time that Down East purchased the
 Extended Reporting Endorsement, Niagara never
 told Down East or Morse Payson & Noyes that,
 as it now claims, the Endorsement did not
 apply to government ordered cleanup. If Down
 East had known of that alleged limitation it
 would have made other arrangements. The
 liability risk of government ordered cleanup
 was so great that it would not have canceled
 the policy until alternate coverage was in
 place.

If, as Niagara claims, it had thus far limited its discovery
efforts in preparation of a defense based solely on the
circumstances surrounding the issuance of the principal insurance
policies, Down East's opposition clearly put Niagara on notice that
such a narrow discovery strategy would not suffice. Down East
filed its opposition to summary judgment on November 24, 1997. 
Yet, Niagara did not move to reopen discovery until June 18, 1998
-- less than three weeks before trial was set to begin. We
conclude that after the filing of Down East's opposition on
November 24, 1997, Niagara persisted in its narrow discovery
efforts at its own risk.
 In sum, we find Niagara's claims of prejudice and unfair
surprise disingenuous. "It is well settled that a trial judge has
broad discretion in ruling on pre-trial management matters." 
Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 91 (1st Cir.
1996). The trial judge acted well within his discretion in denying
Niagara's request to reopen discovery at such a late date without
good cause. This court will not now save Niagara from the
consequences of its narrow and artificial reading of Down East's
amended complaint, interrogatory answers, and opposition to
Niagara's motion for summary judgment.
 B. Statute of Limitations
 At the close of evidence, Niagara moved for judgment as
a matter of law on the ground that Down East's claim was barred by
the statute of limitations. The district court denied Niagara's
motion. We review this decision de novo. See Provencher v. CVS
Pharmacy, Div. of Melville Corp., 145 F.3d 5, 13 (1st Cir. 1998). 
Like the district court, we view the record in the light most
favorable to the non-moving party. See Ansin v. River Oaks
Furniture, Inc., 105 F.3d 745, 753 (1st Cir. 1997).
 Both sides agree that the applicable statute of
limitations is six years. See Me. Rev. Stat. Ann. tit. 14, 752. 
The only issue, then, is when Down East's causes of action accrued. 
The district court found that the causes of action accrued either
when Niagara ceased payments, in December 1992, or when Niagara
finally denied coverage, in December 1995. Niagara argues that any
causes of action accrued when Down East canceled the 1986 policy,
on December 23, 1986, and thus predated filing by more than six
years.
 Niagara cites two cases to support this claim. In 
Chiapetta v. Clark Associates, 521 A.2d 697, 699 (Me. 1987),
plaintiff asked his insurer to cover his clam plant, even in the
off-season, when it was closed. The policy did not include such
coverage, and the plant burned during the off-season. Plaintiff
initially assumed that he was covered, discovering only later his
insurer's differing view. Plaintiff sued his insurance agent,
alleging that his cause of action accrued when he discovered the
lack of coverage. The Law Court held that, once his plant was
destroyed, plaintiff had "both reason and means to make an
investigation into the extent of coverage . . . and cannot be heard
to argue that he was not cognizant of any lack of coverage." 
Chiapetta, 521 A.2d at 700. In effect, this ruling charged
plaintiff with constructive notice of policy limitations, dating to
the time of the covered event.
 The Law Court followed Chiapetta in Kasu Corp. v. Blake,
Hall & Sprague, Inc., 582 A.2d 978 (Me. 1990), where plaintiff
Kasu's insurance agent, without Kasu's knowledge, failed to renew
its coverage. After this lapse, an unrelated plaintiff sued Kasu,
and Kasu's insurer denied coverage of litigation costs. Kasu sued
its insurance agent, in contract and in tort, for failing to renew
its policy. The Law Court held that Kasu's tort claims arose when
the suit was filed against Kasu, and its contract claims arose when
the agent failed to renew coverage.
 The Law Court has more recently viewed Chiapetta and Kasuin a more limited light, in Palermo v. Aetna Casualty & Surety Co.,
606 A.2d 797 (Me. 1992). In Palermo, defendant sold plaintiff
insurance including coverage for uninsured motorists. An uninsured
motorist injured plaintiff in 1984; defendant denied coverage in
1987. Palermo sued the insurer in 1991. The Law Court
distinguished Kasu and Chiapetta on two grounds. Since Palermo
sued only in contract, the court declined to consider prior actions
in tort. Considering the contract claims, the Palermo court noted
that in Chiapetta, the "alleged breach was for failure to procure
certain coverage, and that breach occurred before the injury sued
upon." Palermo, 606 A.2d at 798. Similarly, plaintiff in Kasusued the agency for negligent failure to renew a lapsed policy; the
injury occurred when the policy expired. In Palermo, however,
there was no lapse of insurance, only a dispute over its scope. 
Since "Palermo was a covered insured under a policy that ostensibly
covered injuries caused by uninsured motorists . . . any breach
necessarily succeeded the injury." Palermo, 606 A.2d at 798.
 Palermo governs our decision here. In Palermo, as here,
plaintiff directly sued the insurance company; in Chiapetta and
Kasu, plaintiffs sued their insurance agents. In Palermo, as here,
plaintiff contended that her insurance covered her injuries; in
Chiapetta and Kasu, plaintiffs admitted they were uncovered, and
sought relief against their agents for negligent failure to procure
the correct coverage. Finally, the facts of this action
demonstrate why Palermo should control. After an initial,
unrelated denial of coverage, Niagara made substantial payments,
totaling $137,004, towards Down East's claim. These payment cured
any outstanding breach; only once they ceased could Down East again
have notice that Niagara disputed its obligation under the policy. 
Were we to hold otherwise, an unscrupulous insurer faced with an
arguable claim could make small payments for six years, cut off the
insured, and avoid litigation entirely.
 As a result, the six-year limitations period commenced no
earlier than Niagara's final reimbursement in December 1992, and
Niagara's action is not foreclosed. We need not decide whether
Niagara's final denial of coverage, in December 1995, is a more
appropriate date. 
 C. Sufficiency of the Evidence
 At the conclusion of Down East's case and at the close of
evidence, Niagara moved for judgment as a matter of law on the
ground that Down East had failed to produce any evidence to support 
two essential elements of its estoppel claim. The district court
denied both of these motions. Again, we review de novo the
district court's denial of judgment as a matter of law. SeeMcMillan v. Massachusetts Soc'y for the Prevention of Cruelty to
Animals, 140 F.3d 288, 299 (1st Cir. 1998). We must sustain the
district court's denial of a Rule 50(b) motion, "unless the
evidence, together with all reasonable inferences in favor of the
verdict, could lead a reasonable person to only one conclusion,
namely, that the moving party was entitled to judgment." PH Group
Ltd. v. Birch, 985 F.2d 649, 653 (1st Cir. 1993).
 Under Maine law, the elements of estoppel are: "(1)
unreasonable conduct of the insurer that misleads the insured
concerning the scope of his coverage, and (2) justifiable and
detrimental reliance by the insured upon the insurer's conduct." 
Maine Mut. Fire Ins. Co. v. Grant, 674 A.2d 503, 504 (Me. 1996). 
In addition, because Down East bases its estoppel claim on 
misrepresentations made by Quinlan, as an agent of Niagara, Down
East had to prove that Quinlan was acting within the scope of his
authority when he recommended the purchase of the extended
reporting endorsement to Down East. Niagara contends that it was
entitled to judgment as a matter of law because Down East failed to
produce any evidence that (1) Quinlan's conduct was authorized by
Niagara, and (2) Down East justifiably relied on Quinlan's conduct.
 Section 2422 of the Maine Insurance Code states: "The
authorized agent of an insurer shall be regarded as in the place of
the insurer in all respects regarding any insurance effected by
him." Me. Rev. Stat. Ann. tit. 24-A, 2422. Niagara does not
dispute that Quinlan was an "authorized agent" within the meaning
of this statute. Rather, Niagara disputes the scope of Quinlan's
authority. Specifically, Niagara argues that as an "authorized
agent" of Niagara, Quinlan had authority to sell Niagara policies
and generally to act in the best interest of Niagara, as principal. 
Niagara contends that in making his October 9, 1986 proposal to
Down East, Quinlan was acting outside the scope of his authority
because he recommended that Down East cancel its Niagara policy and
purchase a policy with higher coverage limits from ISLIC. In
making this argument, Niagara refuses to acknowledge that Quinlan's
proposal also recommended that Down East purchase an extended
reporting endorsement from Niagara. We agree with the district
court that a reasonable jury could conclude that, by recommending
that Down East purchase an extended reporting endorsement to its
Niagara policy, Quinlan was acting within the scope of his
authority.
 Indeed, Quinlan testified that before selling the
endorsement to Down East, he received express authorization and
approval from an underwriter at Niagara. As Niagara points out,
Quinlan also testified that in recommending that Down East cancel
the Niagara policy and purchase the ISLIC policy with higher
coverage limits he was acting in the best interest of Down East. 
But it does not necessarily follow that his recommendation was
therefore unauthorized. The end result was still the sale of an
extended reporting endorsement issued by Niagara.
 Finally, throughout this litigation, Niagara has not
contested the facial validity of the endorsement drawn up by Morse,
Payson & Noyes. By contesting only the meaning of the
endorsement's terms, Niagara effectively admits that Morse, Payson
& Noyes was authorized to bind Niagara, and validly did so through
the sale of the extended reporting endorsement. Such authorization
is the hallmark of agency. Niagara cannot accept the endorsement
as valid, while simultaneously arguing that Morse, Payson & Noyes
was not authorized to sign it.
 Niagara next challenges the sufficiency of the evidence
supporting Down East's justifiable reliance on Quinlan's
misrepresentations. First, Niagara contends that Down East failed
to produce any evidence that Down East relied on Quinlan's
misrepresentations. However, John Peters, executive vice president
of Down East, testified specifically that in purchasing the
extended reporting endorsement from Niagara he relied on the
recommendation of Quinlan that the endorsement would allow for a
transition from the Niagara policy to the ISLIC policy "with no gap
in coverage." Peters further testified that had Quinlan informed
Down East that coverage under the endorsement was not as broad as
coverage under the 1986 Niagara policy, it would not have canceled
the 1986 policy, but instead would have purchased an additional
policy. Peters's testimony provides sufficient evidence from which
a reasonable jury could conclude that Down East relied on Quinlan's
misrepresentations when it opted to cancel the 1986 policy and
purchase the endorsement.
 There is also sufficient evidence in the record to
support Down East's claim that it relied on Quinlan's
misrepresentations to its detriment. It is undisputed that Quinlan
misrepresented that the endorsement would extend for one year the
reporting period for all claims for past pollution incidents. As
discussed, Peters testified at trial that, in opting to exercise
this option, Down East relied on Quinlan's misrepresentation that
the extension applied to all claims for past pollution, including
claims made as a result of government ordered cleanups. Peters
explained that, had Down East known that the endorsement did not
extend the reporting period for government ordered cleanups, it
would not have not have canceled the 1986 policy, but instead would
have purchased an additional $500,000 policy. It is further
undisputed, for purposes of this appeal, that if Quinlan's
statement had been accurate, Niagara would be liable for the costs
incurred by Down East as a result of the government ordered cleanup
because the claim was brought within the one year extension period. 
Yet, because of its reliance on Quinlan's misrepresentation, Down
East's claims are not covered by the Niagara endorsement. Clearly,
there was sufficient evidence to support Down East's claim of
detrimental reliance.
 Finally, Niagara contends that any reliance by Down East
was unreasonable as a matter of law because the language of the
1986 policy unambiguously limits the extension of the reporting
period to claims for bodily injury and property damage only. At
trial, Peters admitted that he never read the Niagara pollution
liability insurance policies or the terms of the extended reporting
endorsement. Niagara relies on Card v. Nickerson, 104 A.2d 427,
431 (me. 1954), for the proposition that a party may only
successfully assert a claim of estoppel if it "had no knowledge of
the true state of facts, and . . . did not have the same means of
ascertaining the truth as did the other party." Niagara therefore
contends that Down East's failure to read the policies renders its
reliance on Quinlan's misrepresentation unreasonable as a matter of
law. We disagree.
 These circumstances are very different from those in
Card, which involved a real estate transaction between two
neighbors, where both individuals had "the same means of
ascertaining the truth" about the location of a water course on the
parcel that was sold. Id. In the present case, Down East informed
Quinlan of its need to increase its pollution liability insurance
coverage from $500,000 to $1,000,000 due to new federal EPA
requirements. In the fall of 1986, Quinlan and Down East met to
discuss various ways to meet these new insurance requirements. In
the context of these discussions, Quinlan recommended the
cancellation of the 1986 Niagara policy and the purchase of the
extended reporting endorsement. In making this recommendation,
Quinlan was aware of Down East's insurance needs and the risks
posed by its involvement in the gasoline and heating oil industry. 
Peters testified that, as a lay person in the gasoline and home
heating oil business, he did not understand the nuances of
insurance law and therefore relied on the agent's representation
that Down East would have no gaps in coverage.
 We reject Niagara's contention that such reliance was
unreasonable as a matter of law; whether such reliance is
reasonable is a question of fact for the jury. See Roberts v.
Maine Bonding & Casualty Co., 404 A.2d 238, 243 (Me. 1979). 
Roberts held that a "showing that an insurance agent told the
insured that his policy contained full liability coverage may be
sufficient to estop the insurance company from relying on an
exclusion in the policy to deny coverage." Id. at 241-42.
 The circumstances of the present case provide a stronger
case than Roberts or letting the case go to the jury. In Roberts,
the court noted a "factual issue" as to "whether, through the
Defendant's failure to warn the Plaintiff's that occupancy was a
condition of coverage, the Defendant misled the Plaintiffs into the
reasonable belief that the existing vacancy would not bar their
coverage." Id. Here there was not simply a failure to warn but an
affirmative misrepresentation by Quinlan to Down East, at a time
when Quinlan was fully aware of Down East's insurance situation,
that the endorsement would leave "no gaps in coverage." Thus, we
disagree with Niagara that Down East's reliance on Quinlan's
assurance that there would be "no gap in coverage" was unreasonable
as a matter of law. 
III. Conclusion
 For the reasons stated above, we affirm the judgment of
the district court.