USCA1 Opinion

 

 February 17, 1993 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 92-1052 THE PH GROUP LTD., F/K/A, COGNETICS EUROPE LTD, Plaintiff, Appellant, v. DAVID L. BIRCH, ET AL., Defendants, Appellees. _____________________ No. 92-1053 THE PH GROUP LTD., F/K/A COGNETICS EUROPE, LTD., Plaintiff, Appellee, v. DAVID L. BIRCH, Defendant, Appellee, ____________ COGNETICS, INC. Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. W. Arthur Garrity, Jr., Senior U.S. District Judge] __________________________ ____________________ Before Breyer, Chief Judge, ___________ Brown,* Senior Circuit Judge, ____________________ Stahl, Circuit Judge. _____________ ____________________ Edwin A. McCabe with whom Joseph P. Davis, III, Karen Chinn ________________ ______________________ ____________ Lyons, and The McCabe Group were on brief for appellants. _____ ________________ Robert J. Kaler with whom Gadsby & Hannah was on brief for ________________ _________________ appellees. ____________________ February 17, 1993 ____________________ _____________________ *Of the Fifth Circuit, sitting by designation. STAHL, Circuit Judge. This case involves a failed _____________ attempt to license American-made computer software for use in Europe. On appeal, plaintiff The pH Group Ltd., formerly known as Cognetics Europe Ltd. ("PH"), challenges the district court's failure (1) to award it attorneys' fees and (2) to rule favorably on its claims of unfair and deceptive trade practices. Defendants Cognetics, Inc. ("Cognetics") and David L. Birch cross-appeal, taking issue with the district court's denial of their motion for judgment n.o.v. or a new trial on their counterclaims for breach of contract.1 Finding no error in the district court's rulings, we affirm. I. I. __ FACTUAL BACKGROUND AND PRIOR PROCEEDINGS FACTUAL BACKGROUND AND PRIOR PROCEEDINGS ________________________________________ David Birch developed computer software which analyzes Dun & Bradstreet data bases for business consulting purposes.2 In order to exploit this software in the United States, Birch and his associates formed Cognetics. PH was formed by Rolf Hickmann, Norbert Reis, and other individuals principally to develop a consulting business in Europe through the use of the Cognetics software. PH and Cognetics ____________________ 1. Because the interests of Birch and Cognetics are inexorably intertwined for purposes of this appeal, references to Cognetics should be construed as applying equally to Birch. 2. Dun & Bradstreet generates computer data bases which report the financial statistics of private businesses. -2- 2 negotiated a license agreement ("the Agreement"), under which PH received the right to use the Cognetics name and software in Europe. For its part, Cognetics was to provide PH with both Dun & Bradstreet's European data bases and the Cognetics software to analyze them. The parties agreed that Massachusetts law would govern the Agreement's construction. The Agreement was signed in January of 1987, and PH began doing business in Europe. Shortly thereafter, the same individuals who had formed PH incorporated Maven Systems, Ltd. ("Maven").3 The record reflects that Maven was formed to allow the individual owners of PH to pursue consulting business in Europe without using the Cognetics software. The Agreement clearly contemplates and allows for such outside activity.4 Almost immediately, difficulties between the parties surfaced. Essentially, PH claimed that Dun & Bradstreet's European data bases differed from its American data bases, and that Birch and Cognetics knew, or should have ____________________ 3. Maven is not a party to this appeal. Cognetics named Maven as a defendant-in-counterclaim below, but does not appeal the district court's ruling that Maven is not liable on the counterclaims. 4. Section 2(e) of the Agreement, entitled "Other Businesses," states: [N]othing shall preclude [PH] from conducting a business unrelated to [Cognetics] Software, Related Software or Products . . . provided that such business is not conducted under the [Cognetics] Name or any variation thereof. -3- 3 known, that as a result of these differences the European data bases could not be analyzed effectively with Cognetics software. Cognetics, on the other hand, claimed that PH had violated the Agreement by improperly allowing Maven to use the Cognetics name in Maven's initial business dealings. By September 1987, each party was claiming that it had terminated the Agreement. On April 22, 1988, PH sued Cognetics in diversity, alleging common law fraud, breach of contract, negligence, breach of an implied covenant of good faith and fair dealing, breach of an implied warranty of fitness for a particular purpose, and violation of Mass. Gen. Laws Ann. ch. 93A, 2 and 11 (West 1984 and Supp. 1992) (hereinafter referred to collectively as "ch. 93A"), which proscribe unfair and deceptive trade practices. PH sought $10 million in damages on these claims. The complaint also asked for a declaratory judgment that the Agreement's non-competition clause did not preclude PH from pursuing its now established European consulting business.5 Cognetics counterclaimed, alleging breach of contract, misappropriation of trade secrets, unfair ____________________ 5. PH also sought to recover $30,000, a "fixed fee" to be paid to Cognetics for certain services due PH under the Agreement. PH had placed this money into an escrow account when its relations with Cognetics began to sour, and it began to question whether Cognetics would provide the "fixed fee" services. Cognetics never contested PH's entitlement to the $30,000, and the district court awarded the funds to PH. -4- 4 competition, violation of the Lanham Trade-Mark Act, 15 U.S.C.A. 1125(a) (West Supp. 1992), violation of Mass. Gen. Laws Ann. ch. 110B, 12 (West 1990), which forbids trademark infringement, and violation of ch. 93A, 11. Cognetics also sought injunctive relief to prevent further use of its name and proprietary materials. The district court bifurcated the trial and tried all liability issues first. After directing verdicts against several of the parties' substantive claims, the court submitted the following claims to the jury: (1) PH's claims for fraud, breach of contract, and breach of implied covenant of good faith and fair dealing; and (2) Cognetics' claims for misappropriation of trade secrets, and breach of contract. The claims and counterclaims under ch. 93A were tried to the court along with the requests for declaratory and injunctive relief. The jury found against PH on all of its claims except for the claim of breach of an implied covenant of good faith and fair dealing. In the subsequent damages phase of the trial, notwithstanding the favorable verdict, the jury awarded PH zero damages on this claim. The jury found against Cognetics on all of its counterclaims. The district court found no violations of ch. 93A by either party and denied all requests for declaratory and injunctive relief. Finally, the court denied Cognetics' motion for judgment -5- 5 n.o.v. or new trial, and denied PH's motion for attorneys' fees. II. II. ___ DISCUSSION DISCUSSION __________ A. PH's Appeal A. PH's Appeal _______________ 1. PH's Claim for Attorneys' Fees 1. PH's Claim for Attorneys' Fees __________________________________ PH argues that it is entitled to attorneys' fees under section 21 of the Agreement6 because it "prevailed" on its covenant of good faith and fair dealing claim.7 As an initial matter, we note that the parties dispute whether this issue was properly preserved for appeal. Assuming without deciding that the issue was preserved, we find unpersuasive PH's contention that it was a "prevailing party" below. ____________________ 6. Section 21 of the Agreement states: Attorneys' Fees. In any litigation, arbitration or ________________ court proceeding between the parties, the prevailing party shall be entitled to all costs of the proceedings incurred in enforcing this Agreement. 7. At oral argument, PH seemed to argue that the uncontested award of the $30,000 in escrow entitled it to prevailing party status. This argument, however, appears nowhere in the trial record, nor does it appear in PH's appellate brief. It is settled in this circuit that issues adverted to on appeal in a perfunctory manner are deemed to have been abandoned. United States v. St. Cyr, 977 F.2d 698, 701 (1st Cir. 1992). ______________ _______ As a result, we need not address this argument. -6- 6 Courts, both in Massachusetts and elsewhere, have uniformly required that a party succeed on a significant issue in order to be entitled to attorneys' fees. See, e.g., ___ ____ Handy v. Penal Insts. Comm'r of Boston, 592 N.E.2d 1303, 1307 _____ _____________________________ (Mass. 1992) (requiring that party in civil rights case "succeed[] on a significant issue" to be entitled to attorneys' fees); Fedele v. School Comm. of Westwood, 587 ______ __________________________ N.E.2d 757, 761 (Mass. 1992) (same). See also Farrar v. ___ ____ ______ Hobby, 113 S. Ct. 566, 569 (1992) (holding that "[w]hen a _____ [civil rights] plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable [attorneys'] fee is usually no fee at all." (citation omitted)); Texas _____ State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. ____________________ __________________________ 782, 792 (1989) (holding that civil rights plaintiff seeking attorneys' fees "must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant. Beyond this absolute limitation, a technical victory may be so insignificant . . . as to be insufficient to support prevailing party status."); Guglietti _________ v. Secretary of Health and Human Servs., 900 F.2d 397, 399 _____________________________________ (1st Cir. 1990) (requiring either "bottom-line litigatory success" or "catalytic effect in bringing about a desired result" for social security plaintiff to be entitled to attorneys' fees). Moreover, outside of the civil rights -7- 7 context, an award of zero damages, supported by a rational basis in the record, is generally considered a judgment for defendant. See, e.g., Ruiz-Rodriguez v. Colberg-Comas, 882 ___ ____ ______________ _____________ F.2d 15, 17 (1st Cir. 1989) (stating that award of zero damages is "commonly viewed as, in effect, a judgment for defendant"); Poulin Corp. v. Chrysler Corp., 861 F.2d 5, 7 _____________ _______________ (1st Cir. 1988) (holding that, upon award of zero damages, "plaintiff has failed to establish an essential part of its proof, and judgment should have been entered for defendant."). Cf. Farrar, 113 S. Ct. at 573-74 ("Of itself, ___ ______ `the moral satisfaction [that] results from any favorable statement of law' cannot bestow prevailing party status. . . . No material alteration of the legal relationship between the parties occurs until the plaintiff becomes entitled to enforce a judgment, consent decree or settlement against the defendant.") (quoting Hewitt v. Helms, 482 U.S. 755, 762 ______ _____ (1986). The thrust of this authority renders unpersuasive PH's argument that the district court erred in finding that it was not a "prevailing party" under section 21 of the Agreement. Moreover, PH has not proffered any evidence of the parties' intent in drafting section 21 of the Agreement. Nor has it argued, let alone demonstrated, that any construction other than the ordinary construction of the term "prevailing party" should apply. Accordingly, we find no error in the -8- 8 district court's holding that PH was not a "prevailing party" for purposes of section 21 of the Agreement. 2. PH's ch. 93A Claim 2. PH's ch. 93A Claim ______________________ PH also argues that the district court's ruling that Cognetics did not violate ch. 93A is inconsistent as a matter of law with the jury's verdict that Cognetics breached the Agreement's implied covenant of good faith and fair dealing. Massachusetts courts have held, however, that a trial court's ruling on a ch. 93A claim may differ from a jury's verdict on common law claims involving the same evidence. Chamberlayne Sch. v. Banker, 568 N.E.2d 642, 648- _________________ ______ 49 (Mass. App. Ct. 1991) ("Although consistency . . . ha[s] a surface appeal, we think the broader scope and more flexible guidelines of ch. 93A permit a judge to make his or her own decisions under [ch.] 93A without being constrained by the jury's findings."). See also Turner v. Johnson & Johnson, ___ ____ ______ __________________ 809 F.2d 90, 102 (1st Cir. 1987) (interpreting Mass. law) (holding that jury's determination is not binding on court's ch. 93A decision); Wallace Motor Sales, Inc. v. American ___________________________ ________ Motor Sales Corp., 780 F.2d 1049, 1063-67 (1st Cir. 1985) __________________ (interpreting Mass. law) (finding no reversible error where district court denied judgment n.o.v. on jury counts, reviewed same evidence, and reached conclusion contrary to jury's verdict on the ch. 93A claim). Moreover, violations of ch. 93A must meet a higher standard of liability than do -9- 9 breaches of an implied covenant of good faith and fair dealing. Compare Anthony's Pier Four, Inc. v. HBC _______ _____________________________ ___ Associates, 583 N.E.2d 806, 820-22 (Mass. 1991) ("[t]he __________ implied covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . .'") (quoting Druker ______ v. Roland Wm. Jutras Assocs., Inc., 348 N.E.2d 763, 765 __________________________________ (Mass. 1976)) with Tagliente v. Himmer, 949 F.2d 1, 7 (1st ____ _________ ______ Cir. 1991) (stating that under ch. 93A, "`[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.'" (quoting Quaker State Oil Refining Corp. _______________________________ v. Garrity Oil Co., Inc., 884 F.2d 1510, 1513 (1st Cir. _______________________ 1989)). As such, PH's claim that the verdicts were legally inconsistent is without merit.8 B. Cognetics' Cross-Appeal B. Cognetics' Cross-Appeal ___________________________ Cognetics appeals the district court's denial of its motion for judgment n.o.v. or new trial on its breach of contract claim. We must sustain the district court's denial ____________________ 8. Although it is not clear from its briefs, PH appears to argue that the district court (a) failed to make findings of fact sufficient to support its ch. 93A ruling and/or (b) inappropriately relied upon the jury's finding that Cognetics committed no fraud. Having carefully reviewed the record, we find that the district court's factual findings were both comprehensive and independent of the jury's fraud verdict. Thus, PH's contentions to the contrary are entirely meritless. -10- 10 of a motion for judgment n.o.v. unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment. Luson Int'l ___________ Distribs., Inc. v. Fabricating and Prod. Mach., Inc., 966 ________________ ___________________________________ F.2d 9, 10-11 (1st Cir. 1992). On the other hand, we review denial of a motion for new trial under an abuse of discretion standard, with a view toward whether "`the verdict was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice.'" Pontarelli v. Stone, 930 __________ _____ F.2d 104, 113 (1st Cir. 1991) (quoting Hendricks & Assocs., _____________________ Inc. v. Daewoo Corp., 923 F.2d 209, 217 (1st Cir. 1991)). ____ ____________ Cognetics presented uncontroverted evidence at trial that the Cognetics name appeared on two separate Maven products. On the first occasion, the Cognetics name appeared in a Maven slide presentation at the bottom of every page. On the second occasion, it appeared on the first and last pages of a 43-page Maven presentation. On both occasions, the Maven products were produced without the use of Cognetics software.9 Cognetics argues that this evidence can only ____________________ 9. Cognetics cites a third and different use of the Cognetics name in arguing that section 2(b) was breached. On this third occasion, PH used the Cognetics name in a product proposal, but the final product used neither the Cognetics name or software. We fail to see how such evidence relates to sublicensing. PH's use of the Cognetics name in product proposals is clearly contemplated by the Agreement. More importantly, this third example presents no evidence that Maven, or any other alleged "sublicensee," actually used the -11- 11 lead to one conclusion, namely, that PH breached section 2(b),10 the Agreement's sublicensing provision. We disagree. In determining whether a breach of the Agreement's sublicensing provision has occurred, we must first define the terms "licensing" and "sublicensing" as they are used in the Agreement. We consider the terms "in light of all the other phraseology in the instrument," and "in light of the circumstances of the transaction." McDonald's Corp. v. Lebow ________________ _____ Realty Trust, 888 F.2d 912, 913-14 (1st Cir. 1989) (citations ____________ omitted). ____________________ Cognetics name or software. PH's use of the Cognetics name in this situation might support a claim that PH breached section 11(e) of the Agreement, which states that neither PH nor its affiliates may market products which compete with Cognetics products. However, this evidence does not support Cognetics' claim that PH improperly sublicensed its rights under the Agreement. 10. Section 2(b) provides: Sublicense Right. Cognetics grants to [PH] the right to sublicense its rights under Section 2(a) to an entity or entities which are wholly owned by [PH], provided however, that (i) [PH] notifies Cognetics in advance and in writing with respect to such sub-license, (ii) the foregoing right shall not relieve [PH] from its obligations hereunder, and (iii) such sub-licensee is subject to all of the terms and conditions of this Agreement. Cognetics may, in advance of such sub-license, require any reasonable documentation of [PH] and its sub-licensee in order to assure sub-licensee's agreement to the foregoing. -12- 12 As we read section 2(a)11 of the Agreement, licensing consists of three elements: (1) an agreement; (2) which permits the licensee to use the Cognetics name in tandem with the Cognetics software; (3) in an ongoing commercial manner. These three characteristics ensure that PH, the licensee, can establish a viable consulting business in Europe through the use of the Cognetics name and software. Section 2(b), in turn, grants PH the right to "sublicense" its rights under the Agreement to wholly owned third parties. Sublicensing under 2(b) is similar to licensing under 2(a). It consists of: (1) an agreement; (2) whereby PH grants a third party permission to use the Cognetics name in tandem with the Cognetics software; (3) for ongoing commercial purposes. ____________________ 11. Section 2(a) provides: Software and Name License. Cognetics hereby grants _________________________ to Licensee the exclusive, non-transferable right and license without right of sublicense, except as specifically provided in subsection (b) hereof, (the "License"), to (i) use the Object Code version of the [Cognetics] Software and any Related Software, including but not limited to any Improvements, and all Software Documentation, (ii) use and to commercialize the Name, including but not limited to as part of the Name under which Licensee does business in the European Market, provided, however, that use of the Name shall be solely in respect of [Cognetics] Products and (iii) use, market, sell and otherwise to commercialize the Products, provided however, that all the foregoing is granted throughout but solely within the European Market. -13- 13 In order to prove a breach of section 2(b), Cognetics would first have to establish the existence of a sublicensing agreement between PH and Maven. Cognetics would then have to show that the sublicensing was improper under section 2(b) or some other provision of the Agreement. Cognetics has failed to allege or demonstrate that any such sublicensing occurred. Both at trial and on appeal, Cognetics seems to rely on the mistaken assumption that any misuse of the Cognetics name by Maven or PH, whether intentional or inadvertent, conclusively demonstrates improper sublicensing in breach of section 2(b) on the part of PH. However, not all misuses of the Cognetics name by non-sublicensed third parties amount to breaches of section 2(b). General misuses of the Cognetics name may be actionable under several of the Agreement's provisions.12 However, in order to give rise to a claim under section 2(b), the misuse must take place in the context of an improper sublicensing agreement. At trial, PH's principals testified that Maven's misuse was essentially inadvertent. For example, Rolf ____________________ 12. For example, section 6(c) states that PH acquires no proprietary interest in the Cognetics name; section 11 states that both parties agree to preserve the confidentiality of proprietary material; section 14 states that PH will notify Cognetics of any infringements of the Agreement by third parties; and section 16 states that PH may not assign its rights or obligations under the contract without Cognetics' consent. -14- 14 Hickmann, a principal of both PH and Maven, testified that the use of the Cognetics name in Maven's slide presentation was "careless," and that, between them, PH and Maven "could only afford one set of stationery for slide material." Cognetics offered no contrary evidence showing that the misuses of the Cognetics name were in fact due to an improper sublicensing agreement. At best, Cognetics has demonstrated that PH and/or Maven misused the Cognetics name on two occasions. Standing alone, this evidence of misuse does not conclusively show that PH improperly sublicensed its rights to Maven, or that PH breached section 2(b) of the Agreement. Thus, contrary to Cognetics' claim in its post-trial motion, the evidence does not lead inexorably to the conclusion that PH improperly sublicensed its rights to Maven in breach of section 2(b) of the Agreement. A reasonable jury could have concluded that Maven's misuse of the Cognetics name was inadvertent. In fact, we find no evidence in the record which would allow a jury to conclude otherwise. Accordingly, the district court properly denied Cognetics' motion for judgment n.o.v. By the same token, the verdict is not clearly against the weight of the evidence and presents no manifest -15- 15 miscarriage of justice. Thus, the district court committed no error in denying Cognetics' motion for new trial.13 For the foregoing reasons, the judgment of the district court is affirmed. ________ ____________________ 13. Cognetics also challenges the district court's instructions to the jury on section 2(b). The district court instructed the jury that only "material" breaches of section 2(b) give rise to a right to terminate the Agreement. Cognetics argues that under the Agreement, non-material breaches of section 2(b) also give rise to a right to terminate, and that the district court's failure to so instruct entitles it to judgment n.o.v. or a new trial. We assume without deciding that non-material breaches of section 2(b) give rise to a right to terminate. Nonetheless, as we have noted above, Cognetics failed to allege or demonstrate a breach of section 2(b), material or otherwise. Thus, even if the district court's instruction on section 2(b) was incorrect, the evidence does not necessarily lead to the conclusion that a non-material breach of 2(b) occurred. Nor can we say that the verdict was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice. Accordingly, Cognetics' argument regarding jury instructions does not alter our determination that the district court properly denied Cognetics' motion for judgment n.o.v. or new trial. -16- 16