<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-1584

                  SHEILS TITLE COMPANY, INC.,

                      Plaintiff, Appellee,

                               v.

             COMMONWEALTH LAND TITLE INSURANCE CO.,

                     Defendant, Appellant.

                      ____________________

No. 98-1585

                  SHEILS TITLE COMPANY, INC.,

                     Plaintiff, Appellant,

                               v.

             COMMONWEALTH LAND TITLE INSURANCE CO.,

                      Defendant, Appellee.

                      ____________________

         APPEALS FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Carmen Consuelo Cerezo, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

             Coffin and Cyr, Senior Circuit Judges.

                     _____________________

   Rafael Escalera-Rodrguez, with whom Thomas J. Code, Reichard
& Escalera, Stuart H. Singer, Carlos M. Sires, Richard J. Brener
and Kirkpatrick & Lockhart LLP were on brief, for Commonwealth Land
Title Insurance Company.
   Fernando L. Gallardo, with whom Woods & Woods, were on brief
for Sheils Title Company, Inc.

                      ____________________

                         July 15, 1999
                      ____________________

        TORRUELLA, Chief Judge.  The underlying dispute in this
case arises out of an April 1, 1993 agency agreement entered into
between Commonwealth Land Title Insurance Company ("Commonwealth")
and Sheils Title Company, Inc. ("Sheils").  Under the agreement,
Sheils was appointed a non-exclusive agent of Commonwealth, and was
authorized to solicit and issue Commonwealth title insurance
policies in Puerto Rico.  By letter dated January 13, 1995,
Commonwealth informed Sheils that the agency agreement would be
terminated, effective ninety days from the date of the letter.  On
January 25, 1995, Sheils initiated this action in the United States
District Court for the District of Puerto Rico alleging that
Commonwealth's termination of the agreement violated P.R. Laws Ann.
tit. 10,  278a ("Law 75").  Commonwealth counterclaimed for
recovery of payments it made as a result of Sheils's alleged
negligence in the issuance of certain title insurance policies.
        On August 23, 1997, a jury returned a verdict in favor of
Sheils on both Sheils's Law 75 claim and Commonwealth's
counterclaim.  The district court entered judgment on September 5,
1997.  On September 11, Commonwealth renewed its motion for
judgment as a matter of law, and, in the alternative, only with
respect to its counterclaim, for a new trial.  Sheils also moved
for a new trial solely on the issue of Law 75 damages.  On
March 13, 1998, the district court issued an Opinion and Order
denying all of these post-verdict motions.  Commonwealth and Sheils
both appeal.

                           BACKGROUND
        Commonwealth insures title to, and other interests in,
real property in all fifty states and in Puerto Rico.  On April 1,
1993, Commonwealth and Sheils entered into an agency agreement
under which Sheils became a non-exclusive agent of Commmonwealth.  
The agreement authorized Sheils to solicit and issue Commonwealth
title insurance policies in Puerto Rico.  The majority of the
policies issued by Commonwealth on the island were mortgagee
policies, insuring the mortgage interest of the lender and its
successors in interest.  The purchasers of these mortgagee policies
were institutional lenders.
        Under the terms of the agency agreement, Sheils was
authorized to issue policies under $1,000,000 without obtaining
prior consent from Commonwealth.  Sheils was also authorized to
collect the premiums belonging to Commonwealth on its behalf.  
Although the policies were issued by Sheils as Commonwealth's
agent, Commonwealth bore all the risk of liability under the
policies.
        Because Commonwealth bore all the risk of liability, the
agency agreement contained several provisions restricting Sheils's
discretion in issuing Commonwealth policies.  One of these
provisions prohibited Sheils from engaging in conflict of interest
transactions without first obtaining written consent from
Commonwealth.  Another provision permitted Commonwealth to
terminate the agency agreement upon ninety days notice in the event
that losses resulting from policies "produced by" Sheils exceeded
25% of annual net premium dollars received from Sheils in a given
year.
        Prior to termination of the agency agreement, Sheils
conducted business with a number of Puerto Rico financial
institutions, including Bankers Finance Mortgage Corporation
("Bankers Finance").  Sheils issued numerous Commonwealth mortgagee
title insurance policies to Bankers Finance.  At the time those
policies were issued, Michael Sheils, the president and owner of
Sheils Title, owned up to 9% of the stock of Bankers Finance.  
Michael Sheils never obtained written consent from Commonwealth to
issue Commonwealth title insurance policies to Bankers Finance.
        As an institutional lender, Bankers Finance routinely
issued residential mortgage loans and purchased corresponding
mortgagee title insurance policies.  Each title insurance policy
insured that the mortgage acquired by Bankers Finance as security
for the loan was the first and primary lien on the property.  
Because the vast majority of Bankers Finance residential mortgage
loans were made in the context of a refinancing of an existing
mortgage loan, it was often necessary for the existing mortgage
loan to be discharged in order for the Bankers Finance loan to
attain first priority.  The typical practice in the industry was to
use the Bankers Finance loan proceeds to discharge the existing
mortgage in order to attain first priority for the Bankers Finance
mortgage interest.
        Unfortunately, Bankers Finance did not follow the typical
practice.  Instead, Jos Alegra, the President of Bankers Finance,
engaged in a fraudulent scheme whereby he falsely represented to
Sheils that the Bankers Finance loan proceeds were being used to
discharge the existing loans.  In reliance on this representation,
Sheils issued title insurance policies insuring that the Bankers
Finance mortgage interest was the first and primary lien on various
properties.
        Once Bankers Finance acquired title insurance from
Sheils, its mortgage interests became marketable.  Bankers Finance
sold several of its mortgage notes to Citibank.  Upon acquisition,
Citibank became the insured under the Sheils-issued title insurance
policy.  Eventually, Citibank discovered that the mortgage notes it
had purchased from Bankers Finance did not have first priority
status because the prior liens had not been discharged.  Citibank
promptly submitted claims to Sheils under the corresponding
Commonwealth title insurance policies.  All of the claims submitted  
by Citibank resulted from title insurance policies issued by
Sheils.
        In 1994, the losses suffered by Commonwealth as a result
of claims made under Sheils-issued title insurance policies
exceeded 250% of the net premium dollars received from Sheils --
ten times the percentage required to trigger Commonwealth's right
to terminate the agency agreement under Paragraph 16(c)1, the
excessive claims provision.  Accordingly, by letter dated
January 13, 1995, Commonwealth informed Sheils that the agency
agreement would be terminated, effective ninety days after the date
of the letter.
                           DISCUSSION
1.  The Applicability of Law 75
        At the close of evidence, Commonwealth moved for judgment
as a matter of law on Sheils's Law 75 claim.  In its motion,
Commonwealth argued that it was entitled to judgment on the ground
that Sheils failed to produce any evidence that the
Commonwealth/Sheils relationship was protected by Law 75.
        Law 75 was enacted to prevent suppliers from arbitrarily
terminating dealers in Puerto Rico once these dealers had invested
in the business to create and build a profitable market for the
suppliers' products.  See Newell Puerto Rico, Ltd. v. Rubbermaid
Inc., 20 F.3d 15, 22 (1st Cir. 1994).  The effect of Law 75 is not
only to protect local distributors from arbitrary termination, but
also to bind the supplier to the dealership agreement unless it can
prove "just cause" for termination.  See 10 L.P.R.A.  278a.  If
a supplier cannot prove "just cause" for termination of a
dealership agreement, the statute authorizes the court to
compensate the dealer "for the hard-earned clientele unjustly
appropriated by the supplier."  Nike Int'l Ltd. v. Athletic Sales,
Inc., 689 F. Supp. 1235, 1238 (D.P.R. 1988).
        Not all commercial relationships are protected by Law 75.  
Rather, before invoking the remedies provided by the statute, a
court must first determine whether the commercial relationship at
issue constitutes a "dealer's contract" within the meaning of
278(b).  In San Juan Mercantile Corp. v. Canadian Transp. Co.,
the Puerto Rico Supreme Court defined a Law 75 "dealer" as
                 one characterized by his endeavors to create a
        favorable market and to draw customers to a
        product or service by promoting and closing
        sales contracts . . . . Publicity, market
        coordination, merchandise deliveries,
        collections, the keeping of an inventory, and
        mainly the promotion and closing of sales
        contracts are, in general terms, the
        obligations of the dealer.

P.R. Offic. Trans. No. O-78-97, slip op. at 220-21, 108 D.P.R. 211,
215 (Dec. 28, 1978).
        Ten years later, in Roberco, Inc. v. Oxford Indus., Inc.,
the Puerto Rico Supreme Court further clarified the definition of
"dealer" by providing a non-exhaustive list of factors to be taken
into consideration in determining whether an entity or person has
achieved protected status under Law 75:
                 In order to determine if a 'dealership' is
        involved, several factors must be taken into
        consideration, among them, if the 'dealer'
        actively promotes the product and/or concludes
        contracts; if he keeps an inventory; if he has
        a say on price fixing; if he has discretion to
        fix the sale terms; if he has delivery and
        billing responsibilities and authority to
        extend credit; if he independently or jointly
        embarks on advertising campaigns; if he has
        assumed the risks and responsibilities for the
        activities undertaken; if he buys the product;
        and if he has facilities and offers product-
        related services to his clients.  More could
        be added inasmuch as a complete list is not
        intended.  

122 D.P.R. 115, at 131-32, P.R. Offic. Trans. No. RE-85-300, slip
op. at 13 (June 30, 1988).  The Roberco court also explained that
"no single factor is conclusive by itself and none has more weight
or importance than the others."  Id.
        Despite its acknowledgment of the Roberco factors,
Commonwealth argues that the subsequent Puerto Rico Supreme Court
decision in Oliveras v. Universal Ins. Co., 96 J.T.S. 45, P.R.
Offic. Trans. RE-89-435/RE-89-439, slip. op. (Nov. 7, 1996),
compels a finding that the relationship between Commonwealth and
Sheils Title falls outside the scope of protection of Law 75.  In
making this argument, Commonwealth asserts that the Oliveras court
applied the Roberco factors to the relationship at issue in that
case and held that the relationship was not protected by Law 75.  
Because of the "striking similarities" between the
Oliveras/Universal relationship and the Commonwealth/Sheils
relationship, Commonwealth contends that the Oliveras decision
entitles it to judgment as a matter of law on Sheils's Law 75
claim.
        We disagree with Commonwealth's statement of the holding
of Oliveras.  In that case, Oliveras, Inc. ("Oliveras") entered
into a non-exclusive agency agreement with the Universal Insurance
Company ("Universal").  See id. at 290, slip op. at 8.  When
Universal decided to cancel the agreement, Oliveras filed a
complaint alleging arbitrary termination under Law 75, and breach
of contract.  See id. at 291, slip op. at 10.  Ultimately, the
trial court entered judgment in favor of Oliveras on the breach of
contract cause of action in the amount of $1,093,106, and both
parties appealed.  See id. at 291, slip op. at 10-11.  Before the
Puerto Rico Supreme Court, Oliveras claimed that the court of first
instance erred by not awarding it Law 75 damages.  See id. at 291,
slip op. at 11.
        In Oliveras, the court did not hold that the
Oliveras/Univeral relationship was not protected by Law 75.  
Rather, the court concluded that it did not need to make the
determination whether Oliveras was entitled to Law 75 damages
because
                 [e]ven assuming, for argumentative purposes,
        that the contractual relationship that existed
        between Universal and Oliveras was protected
        by the aforecited Law 75, it is our criteria
        that the concession of damages to Oliveras is
        not pertinent: this because we understand that
        Universal had "just cause" to cancel the
        existing agreement.

Oliveras, 96 J.T.S. at 294-95, slip op. at 15.  Because the
Oliveras Court did not reach the question of the applicability of
Law 75, its decision clearly does not compel a finding that the
Commonwealth/Sheils relationship falls outside the scope of
protection of Law 75.
        Having said this, and mindful of the care that the
Oliveras court took in assuming only argumentatively the
applicability of Law 75, we find ourselves in the same position.  
As we shall explain, even assuming, without deciding, that the
relationship of Sheils to Commonwealth is that of a "dealership,"
we conclude that Commonwealth had "just cause" to terminate the
agency agreement.
2.  "Just Cause"
        Commonwealth next challenges the district court's denial  
of judgment as a matter of law with respect to Commonwealth's claim
that "just cause" existed for its termination of the agency
agreement.  At the outset, it is important to note that Law 75 was
not intended to prevent termination of unworkable relationships,
but only to prevent arbitrary terminations.  See R.W. Int'l Corp.
v. Welch Food, Inc., 13 F.3d 478, 485 (1st Cir. 1994).  
Commonwealth asserts two grounds for its termination of the agency
agreement, and argues that both grounds constitute "just cause" as
a matter of law.  See supra note 8.
        Commonwealth first points to Sheils's performance during
calendar years 1993 and 1994, which triggered the exercise of
Commonwealth's rights under Paragraph 16(c)1 of the agency
agreement.  Under Paragraph 16(c)1, Commonwealth reserved the right
to terminate the agreement, with ninety days written notice, if
"[d]uring any calendar year . . . claims expense produced by the
AGENT exceeds 25% of annual net premium remittance."  At trial,
Commonwealth presented evidence that the claims submitted to
Commonwealth under policies issued by Sheils during calendar years
1993 and 1994 exceeded the amount of annual net premiums by 250% --
more than ten times the percentage required to trigger Paragraph
16(c)1.  Commonwealth argues that the issuance by Sheils of title
insurance policies resulting in over $1.8 million in losses,
constituted "just cause" for termination of Sheils as a
Commonwealth agent.
        Although "just cause" is typically a question of fact for
the jury, see R.W. Int'l Corp. v. Welch Foods, Inc., 88 F.3d 49, 51
(1st Cir. 1996), Sheils does not dispute the historical facts upon
which Commonwealth bases its right to exercise the excessive claims
provision.  Nor does Sheils make the argument that Paragraph 16(c)1
was not an "essential obligation" of the dealer's contract.  See
P.R. Laws Ann. tit. 10,  278(d).  Rather, Sheils contends that
Paragraph 16(c)1 should not apply because its language does not
accurately reflect the way that the title insurance business is
conducted in Puerto Rico.  Specifically, Sheils argues that the
"produced by" language of the excessive claims provision renders
that provision inapplicable to Puerto Rico title insurance agents
because in Puerto Rico title insurance agents do not "produce"
claims.  With respect to the $1.8 million of claims submitted by
Citibank to Commonwealth, Sheils makes the novel argument that
those claims were "produced by" Bankers Finance, and, more
specifically, by the misdeeds of its president, Jos Alegra -- not
by Sheils.
        Sheils's argument, although imaginative, cannot prevail.  
Regardless of the way in which the title insurance business is
conducted in Puerto Rico, see supra, note 11, we conclude that
Commonwealth reasonably intended and understood the term "produced"
to include within its scope all claims expenses resulting from
policies issued by Sheils.  We reach this conclusion after
carefully considering the nature of the title insurance industry
and the evidence presented at trial.
        First, the reality of title insurance is that it insures
failures to discover existing flaws or defects in title.  As such,
title insurance differs significantly from other types of
insurance.  Weigel explained this difference at trial:
                 A:  Our business is a little bit different.  
        More -- most other kinds of insurance, the
        whole idea is they assume the risk.  In our
        business we try to eliminate the risk or to
        avoid the risk.

                 Q:  How is that possible?   

                 A:  It is possible when you take a look at the
        historical record of a title and search the
        title properly and make sure that the liens on
        the property are discharged and do all of the
        research necessary and file all of the proper
        documents, you eliminate the risk involved in
        a title insurance policy.

                 Q: How is that different [from] a life
        insurance company when it examines someone to
        issue a life insurance policy?

                 A:  People make comparisons with a doctor's
        examination.  If you think about examining the
        title as you do about examining the person,
        the difference is if you examine the title and
        you do the job you are eliminating the
        possibility of anything bad happening.  You
        are eliminating the possibility of a claim.

(Tr. 8/19/97 Afternoon Sess. at 31-32.)  As Weigel explained, title
insurance is unique in that it looks backwards, not forwards, and
insures the validity and accuracy of an existing, historical
document.  This historical focus is a double-edged sword from the
perspective of a title insurance agent.  On the one hand, it
renders agents entirely capable of eliminating risk of liability
under the terms of a title insurance policy.  On the other hand, it
means that any claims expenses that result will, in most cases, be
caused directly or indirectly by the agent.  Commonwealth presented
evidence at trial to this effect:
                 Q:  Let me ask you a little bit about the
        difference or the elements that make our kind
        of insurance different.  How would you compare
        our business in terms of the assumption of
        risk with other insurance business?

                 A:  We're all insurance companies.  We assume
        the risk in exchange for a premium, for an
        amount of money that we're paid to assume
        that.  The agent in all cases is the person
        that can -- is there to protect the company
        from, prevent losses.  The example that I
        would say is that in an auto insurance
        company, for example, you're going to run a --
        check the driving record of the driver.  If
        you find out that the driver has been arrested
        five times for drunk driving and crashed
        several times, you're not going to insure him
        . . . And it's the same way with title
        insurance.

                 Q:  Yes, but in other types of insurance you
        can have the best driver in the world and you
        can -- and he can have an accident and you can
        have the healthiest guy die.  Is that our
        business, sir?   

                 A:  Yes.  We have a risk, but again it's back
        to the agent.  The agent is in the position
        and in title insurance the primary thing that
        the agent must do is make sure that [the]
        prior mortgage has been canceled, it's been
        paid before they issue that new policy.

(Tr. 8/13/97 Morning Sess. at 28-29.)  The undisputed testimony of
both Smith and Weigel establishes that, because of the unique
nature of the title insurance industry, title agents directly or
indirectly cause most claims expenses.  In light of this
uncontested evidence, the intended meaning of the "produced by"
term in Paragraph 16(c)1 is clear.  We conclude that Commonwealth
reasonably intended and expected the term "produced by" to include
within the scope of Paragraph 16(c)1 all claims expenses resulting
from policies issued by Sheils.
        Sheils's second argument fares no better.  Sheils argues
that, assuming arguendo that the excessive claims provision is
applicable to it as a Puerto Rico title insurance agent,
Commonwealth failed to carry its burden under  278a-1(c) to prove
that the 25% provision was reasonable given the realities of the
Puerto Rican market.  Section 278a-1(c) states:
                 The violation or nonperformance by the dealer
        of any provision included in the dealer's
        contract fixing rules of conduct or
        distribution quotas or goals because it does
        not adjust to the realities of the Puerto
        Rican market at the time of the violation or
        nonperformance by the dealer shall not be
        deemed just cause.  The burden of proof to
        show the reasonableness of the rule of conduct
        or of the quota or goal fixed shall rest on
        the principal or grantor.

P.R. Laws Ann. tit. 10,  278a-1(c).  In making this argument,
however, Sheils ignores the evidence in the record that
Commonwealth's other agents in Puerto Rico were able to maintain
their claims expense at under 11% of their annual net remittances.  
At trial, Donald C. Weigel, President of northern operations for
Commonwealth, specifically testified as to the reasonableness of
the 25% excessive claims provision in the Commonwealth/Sheils
agreement:
                     Q.  Tell us, according to the company numbers
            for the same period of time, what was the
            situation in Puerto Rico if you consider
            all of your agents except Sheils Title?
                  
                     A:  Without Sheils Title you will see that our
            claims experience there is 10.9%, which is
            below the national average, which means
            for the company it [Puerto Rico] is an
            attractive place to do business.   

(Tr. 8/19/97 Afternoon Session at 29.)  The testimony of Mr. Weigel
to the effect that Commonwealth's other agents in Puerto Rico were
able to maintain their claims expenses well under 25% is sufficient
evidence of the reasonableness of the excessive claims provision to
satisfy Commonwealth's burden under  278a-1(c).  Moreover, Sheils
failed to come forward with any contradictory evidence on this
point.
        Again, the language of Paragraph 16(c)1 is clear and
unambiguous: Commonwealth is entitled to terminate Sheils as its
agent when, during any calendar year, the claims expense on
policies issued by Sheils exceeds 25% of annual net premiums.  The
facts are not in dispute.  The claims submitted to Commonwealth
under Sheils-issued policies exceeded at least 250% of the net
premiums in calendar years 1993 and 1994.  After careful
consideration of the record, we conclude that Commonwealth had
"just cause", as a matter of law, to terminate Sheils as its agent.
        Because we find that the excessive claims provision
constituted "just cause" for termination of the Commonwealth/Sheils
agency agreement, we need not reach Commonwealth's second ground
for termination: the conflict of interest provision.
        Our conclusion also renders moot Sheils's appeal from the
district court's denial of its motion for a new trial on the issue
of Law 75 damages.  Sheils is no longer entitled to Law 75 damages,
let alone a new trial.
3.  Commonwealth's Counterclaim for Negligence
        In response to Sheils's complaint alleging arbitrary
termination in violation of Law 75, Commonwealth asserted a
counterclaim against Sheils for recovery of the approximately $1.8
million it paid in claims as a result of Sheils's alleged
negligence.  Commonwealth's based its counterclaim on Paragraph
13(a) of the agency agreement, which provides that Sheils shall be
liable to Commonwealth for "any loss, cost or expense . . .
sustained or incurred by [Commonwealth] and arising from the fraud,
negligence or misconduct of [Sheils]."  Commonwealth argued that
Sheils was negligent in failing to assure that existing mortgages
were in fact being discharged prior to insuring the priority of new
mortgages.
        To recover damages based on Sheils's negligence under
Paragraph 13(a), Commonwealth was required to prove that: (1)
Sheils owed a duty to Commonwealth to conform its conduct to a
reasonable standard of care; (2) Sheils breached that duty; and (3)
Sheils's breach caused Commonwealth harm.  See Tokio Marine & Fire
Ins. Co., Ltd. v. Grove Mfg. Co., 958 F.2d 1169, 1171 (1st Cir.
1992).  At trial, Sheils did not dispute the first element of this
cause of action; it acknowledged that as Commonwealth's title
insurance agent it owed a duty to Commonwealth to ensure that prior
liens were timely paid and canceled.  Rather, Sheils disputed the
second element: namely, that the steps it took and the procedures
it implemented to fulfill this duty fell below a reasonable
standard of care.
        At the close of evidence, the jury returned a verdict
against Commonwealth on its negligence counterclaim.  After
judgment was entered, Commonwealth moved for judgment as a matter
of law, or, in the alternative for a new trial on its counterclaim.  
The district court denied both motions, and Commonwealth now
appeals.
        Our review of a denial of judgment as a matter of law is
severely circumscribed.  See Conway v. Electro Switch Corp., 825
F.2d 593, 598 (1st Cir. 1987).  We must sustain the district
court's denial of a Fed. R. Civ. P. 50(b) motion, "unless the
evidence, together with all reasonable inferences in favor of the
verdict, could lead a reasonable person to only one conclusion,
namely, that the moving party was entitled to judgment."  Birch v.
PH Group, 985 F.2d 649, 653 (1st Cir. 1993).
        On the other hand, we review denial of a motion for a new
trial for abuse of discretion.  See id.  Under Fed. R. Civ. P. 59,
a trial judge has ample power to set aside the verdict and grant a
new trial if he or she is of the opinion that the verdict is
against the clear weight of the evidence.  See Coffran v. Hitchcock
Clinic, Inc., 683 F.2d 5, 6 (1st Cir. 1982).  In denying a motion
for a new trial, there is no abuse of discretion unless "the
verdict was so clearly against the weight of the evidence as to
amount to a manifest miscarriage of justice."  PH Group, 985 F.2d
at 653 (citations and quotations omitted).  With these standards in
mind, we examine the evidence presented at trial to determine
whether Commonwealth's allegations of error are correct.
        At trial, Sheils presented evidence that to fulfill its
duty of care to Commonwealth it employed in-house attorneys and
other personnel to perform spot checks of the payment and
cancellation of prior liens.  Michael Sheils explained the
procedure utilized by the company:
                 say we would close 100 cases in one month.  
        Maybe we would check 20 of them and not check
        them all.  It was impossible to check them
        all.  We would send several investigators to
        the registry . . . . to make sure that the
        cancellation of Bank No. 2 canceling Bank No.
        1's mortgage, we wanted to make sure that was
        canceled.

(Tr. 7/17/97 Morning Session at 75-76.)  One of the attorneys
employed to perform these spot checks, Robert Segarra, further
testified that spot checking was the typical business practice of
title insurance agents in Puerto Rico, and that his current
employer, San Juan Abstract Company, utilized the same procedure.
        With respect to the policies issued to Bankers Finance,
Sheils also presented evidence of its efforts to obtain additional
verification -- beyond the spot checks -- of the cancellation of
prior mortgages.  Specifically, Segarra testified that, pursuant to
instructions from Michael Sheils, he wrote a letter dated June 30,
1993 to Jos Gmez Alegra, the attorney for Bankers Finance,
requesting confirmation that Bankers Finance was performing timely
cancellations.  The Bankers Finance attorney responded, in writing,
that cancellations were being performed diligently.  In the letter,
Gmez Alegra explained the procedure utilized by Bankers Finance
to ensure timely cancellations: namely, that a messenger of Bankers
Finance would hand-deliver a check in the amount of the outstanding
lien to the prior lienholder.  Gmez Alegra even extended a
personal invitation to Segarra to visit the Bankers Finance offices
to observe its procedures and to obtain further verification of the
timely payment of prior liens.
        Most significantly, several employees of Bankers Finance
testified that the nonpayment of prior mortgages was top secret at
Bankers Finance, and that only a small group of employees knew that
Lourdes Ramos was concealing the cut checks in a Federal Express
box in the top drawer of her desk pursuant to Jos Alegra's
orders.  There is no evidence in the record that Sheils was aware
that these checks were not being forwarded to prior lienholders.
        After hearing all of the evidence, the jury concluded
that Sheils's spot-check procedures and its additional follow-up
with Gmez Alegra satisfied its duty of care to Commonwealth to
ensure that prior mortgages were timely discharged.  We cannot
agree that this conclusion was unreasonable.  We do not consider
the jury's verdict "so clearly against the weight of the evidence
as to amount to a manifest miscarriage of justice."  PH Group, 985
F.2d at 653 (citations and quotations omitted).  We, therefore,
affirm the district court's denial of Commonwealth's motion for
judgment as a matter of law and for a new trial with respect to its
negligence counterclaim.
                           CONCLUSION
        For the reasons stated above, we reverse the district
court's denial of judgment as a matter of law with respect to the
existence of "just cause" for Commonwealth's termination of the
agency agreement.  However, we affirm the district court's denial
of judgment as a matter of law with respect to Commonwealth's
counterclaim for negligence.

</body>

</html>