**SHEILS TITLE COMPANY, INC.,**
**Plaintiff, Appellee,**

v.

**COMMONWEALTH LAND TITLE**
**INSURANCE CO., Defendant,**
**Appellant.**

**Nos. 98–1584, 98–1585.**

United States Court of Appeals,
First Circuit.

Heard March 4, 1999.

Decided July 15, 1999.

Rehearing Denied Aug. 26, 1999.

Rafael Escalera–Rodríguez, with whom Thomas J. Code, Reichard & Escalera, Stuart H. Singer, Carlos M. Sires, Richard J. Brener and Kirkpatrick & Lockhart LLP were on brief, for Commonwealth Land Title Insurance Company.

Fernando L. Gallardo, with whom Woods & Woods, were on brief for Sheils Title Company, Inc.

Before Torruella, Chief Judge, Coffin and Cyr, Senior Circuit Judges.

TORRUELLA, Chief Judge.

The underlying dispute in this case arises out of an April 1, 1993 agency agreement entered into between Commonwealth Land Title Insurance Company ("Commonwealth") and Sheils Title Company, Inc. ("Sheils"). Under the agreement, Sheils was appointed a non-exclusive agent of Commonwealth, and was authorized to solicit and issue Commonwealth title insurance policies in Puerto Rico. By letter dated January 13, 1995, Common-

wealth informed Sheils that the agency agreement would be terminated, effective ninety days from the date of the letter. On January 25, 1995, Sheils initiated this action in the United States District Court for the District of Puerto Rico alleging that Commonwealth's termination of the agreement violated P.R. Laws Ann. tit. 10, § 278a ("Law 75"). Commonwealth counterclaimed for recovery of payments it made as a result of Sheils's alleged negligence in the issuance of certain title insurance policies.

On August 23, 1997, a jury returned a verdict in favor of Sheils on both Sheils's Law 75 claim and Commonwealth's counterclaim. The district court entered judgment on September 5, 1997. On September 11, Commonwealth renewed its motion for judgment as a matter of law, and, in the alternative, only with respect to its counterclaim, for a new trial. Sheils also moved for a new trial solely on the issue of Law 75 damages. On March 13, 1998, the district court issued an Opinion and Order denying all of these post-verdict motions. Commonwealth and Sheils both appeal.

## BACKGROUND

Commonwealth insures title to, and other interests in, real property in all fifty states and in Puerto Rico. On April 1, 1993, Commonwealth and Sheils entered into an agency agreement under which Sheils became a non-exclusive agent of Commmonwealth. The agreement authorized Sheils to solicit and issue Commonwealth title insurance policies in Puerto Rico. The majority of the policies issued by Commonwealth on the island were mort-

gagee policies, insuring the mortgage interest of the lender and its successors in interest. The purchasers of these mortgagee policies were institutional lenders.

Under the terms of the agency agreement, Sheils was authorized to issue policies under $1,000,000 without obtaining prior consent from Commonwealth. Sheils was also authorized to collect the premiums belonging to Commonwealth on its behalf. Although the policies were issued by Sheils as Commonwealth's agent, Commonwealth bore all the risk of liability under the policies.

Because Commonwealth bore all the risk of liability, the agency agreement contained several provisions restricting Sheils's discretion in issuing Commonwealth policies.[1] One of these provisions prohibited Sheils from engaging in conflict of interest transactions without first obtaining written consent from Commonwealth.[2] Another provision permitted Commonwealth to terminate the agency agreement upon ninety days notice in the event that losses resulting from policies "produced by" Sheils exceeded 25% of annual net premium dollars received from Sheils in a given year.[3]

Prior to termination of the agency agreement, Sheils conducted business with a number of Puerto Rico financial institutions, including Bankers Finance Mortgage Corporation ("Bankers Finance"). Sheils issued numerous Commonwealth mortgagee title insurance policies to Bankers Finance. At the time those policies were issued, Michael Sheils, the president and owner of Sheils Title, owned up to 9%

---

1. For example, in performing its duties, Sheils could not depart from Commonwealth's "instructions, manuals, requirements, directives, guidelines, and rules and regulations." Additionally, Sheils had no discretion to alter the terms of the policy, or the rates to be charged.

2. Paragraph 9(e) of the agency agreement states: "AGENT covenants and agrees with COMPANY that AGENT shall not, without the express written consent of COMPANY: Issue

any Policy with respect to a transaction in which AGENT, or any business associate or family member, has an interest."

3. Paragraph 16(c)1, contained in an addendum to the agency agreement, states: "The COMPANY reserves the right to terminate the Agreement with ninety (90) days written notice ... [d]uring any calendar year if claims expense produced by the AGENT exceeds 25% of annual net premium remittance."

of the stock of Bankers Finance. Michael Sheils never obtained written consent from Commonwealth to issue Commonwealth title insurance policies to Bankers Finance.

As an institutional lender, Bankers Finance routinely issued residential mortgage loans and purchased corresponding mortgagee title insurance policies. Each title insurance policy insured that the mortgage acquired by Bankers Finance as security for the loan was the first and primary lien on the property. Because the vast majority of Bankers Finance residential mortgage loans were made in the context of a refinancing of an existing mortgage loan, it was often necessary for the existing mortgage loan to be discharged in order for the Bankers Finance loan to attain first priority. The typical practice in the industry was to use the Bankers Finance loan proceeds to discharge the existing mortgage in order to attain first priority for the Bankers Finance mortgage interest.

Unfortunately, Bankers Finance did not follow the typical practice. Instead, José Alegría, the President of Bankers Finance, engaged in a fraudulent scheme whereby he falsely represented to Sheils that the Bankers Finance loan proceeds were being used to discharge the existing loans.[4] In reliance on this representation, Sheils issued title insurance policies insuring that the Bankers Finance mortgage interest was the first and primary lien on various properties.

4. Mr. Alegría would forward copies of signed checks made payable to the existing lienholder to Sheils, representing that the loan proceeds were being used to discharge the existing lien. However, the original checks were never sent to the existing lienholder. Instead, José Alegría concealed the original checks in the top drawer of an employee's desk.

5. There is some dispute in the record as to whether losses amounted to 250% or as much as 450%. There is no dispute, however, that losses amounted to at least 250%. Therefore, for purposes of this appeal, we will rely on the 250% figure.

Once Bankers Finance acquired title insurance from Sheils, its mortgage interests became marketable. Bankers Finance sold several of its mortgage notes to Citibank. Upon acquisition, Citibank became the insured under the Sheils-issued title insurance policy. Eventually, Citibank discovered that the mortgage notes it had purchased from Bankers Finance did not have first priority status because the prior liens had not been discharged. Citibank promptly submitted claims to Sheils under the corresponding Commonwealth title insurance policies. All of the claims submitted by Citibank resulted from title insurance policies issued by Sheils.

In 1994, the losses suffered by Commonwealth as a result of claims made under Sheils-issued title insurance policies exceeded 250% of the net premium dollars received from Sheils—ten times the percentage required to trigger Commonwealth's right to terminate the agency agreement under Paragraph 16(c)1, the excessive claims provision.[5] Accordingly, by letter dated January 13, 1995, Commonwealth informed Sheils that the agency agreement would be terminated, effective ninety days after the date of the letter.[6]

## DISCUSSION

### 1. The Applicability of Law 75

At the close of evidence, Commonwealth moved for judgment as a matter of law on Sheils's Law 75 claim.[7] In its motion, Commonwealth argued that it was entitled to judgment on the ground that Sheils

6. In the letter, Commonwealth cited Paragraph 16(c)1, *see supra*, note 3, as grounds for its termination of the agency agreement.

7. Law 75 states:

Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause.

P.R. Laws Ann. tit. 10, § 278a.

failed to produce any evidence that the Commonwealth/Sheils relationship was protected by Law 75.

■ Law 75 was enacted to prevent suppliers from arbitrarily terminating dealers in Puerto Rico once these dealers had invested in the business to create and build a profitable market for the suppliers' products. *See Newell Puerto Rico, Ltd. v. Rubbermaid Inc.*, 20 F.3d 15, 22 (1st Cir. 1994). The effect of Law 75 is not only to protect local distributors from arbitrary termination, but also to bind the supplier to the dealership agreement unless it can prove "just cause" for termination. *See* 10 L.P.R.A. § 278a.[8] If a supplier cannot prove "just cause" for termination of a dealership agreement, the statute authorizes the court to compensate the dealer "for the hard-earned clientele unjustly appropriated by the supplier." *Nike Int'l Ltd. v. Athletic Sales, Inc.*, 689 F.Supp. 1235, 1238 (D.P.R.1988).[9]

Not all commercial relationships are protected by Law 75. Rather, before invoking the remedies provided by the statute, a court must first determine whether the commercial relationship at issue constitutes a "dealer's contract" within the meaning of § 278b.[10] In *San Juan Mercantile Corp. v. Canadian Transp. Co.*, the Puerto Rico Supreme Court defined a Law 75 "dealer" as

> one characterized by his endeavors to create a favorable market and to draw customers to a product or service by

promoting and closing sales contracts.... Publicity, market coordination, merchandise deliveries, collections, the keeping of an inventory, and mainly the promotion and closing of sales contracts are, in general terms, the obligations of the dealer.

P.R. Offic. Trans. No. O–78–97, slip op. at 220–21, 108 D.P.R. 211, 215, 1978 WL 48787 (Dec. 28, 1978).

Ten years later, in *Roberco, Inc. v. Oxford Indus., Inc.*, the Puerto Rico Supreme Court further clarified the definition of "dealer" by providing a non-exhaustive list of factors to be taken into consideration in determining whether an entity or person has achieved protected status under Law 75:

> In order to determine if a "dealership" is involved, several factors must be taken into consideration, among them, if the "dealer" actively promotes the product and/or concludes contracts; if he keeps an inventory; if he has a say on price fixing; if he has discretion to fix the sale terms; if he has delivery and billing responsibilities and authority to extend credit; if he independently or jointly embarks on advertising campaigns; if he has assumed the risks and responsibilities for the activities undertaken; if he buys the product; and if he has facilities and offers product-related services to his clients. More could be added inasmuch as a complete list is not intended.

---

8. Just cause is defined as the:

> nonperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service.

P.R. Laws Ann. tit. 10, § 278(d).

9. More specifically, § 278b provides that if no just cause exists for termination of the dealer's contract "the principal shall have executed a tortious act against the dealer and shall indemnify it to the extent of the damages caused him...." P.R. Laws Ann. tit. 10,

§ 278b. The statute authorizes indemnification of an amount up to five times the dealer's average annual profits, plus goodwill. *See id.*

10. Section 278(b) defines a "dealer's contract" as a

> relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize, or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico.

P.R. Laws Ann. tit. 10, § 278(b).

122 D.P.R. 115, at 131–32, P.R. Offic. Trans. No. RE–85–300, slip op. at 13, 1988 WL 580769 (June 30, 1988). The *Roberco* court also explained that "no single factor is conclusive by itself and none has more weight or importance than the others." *Id.*

Despite its acknowledgment of the *Roberco* factors, Commonwealth argues that the subsequent Puerto Rico Supreme Court decision in *Oliveras v. Universal Ins. Co.,* 96 J.T.S. 45, P.R. Offic. Trans. RE–89–435/RE–89–439, slip. op., 1996 WL 727875 (Nov. 7, 1996), compels a finding that the relationship between Commonwealth and Sheils Title falls outside the scope of protection of Law 75. In making this argument, Commonwealth asserts that the *Oliveras* court applied the *Roberco* factors to the relationship at issue in that case and held that the relationship was not protected by Law 75. Because of the "striking similarities" between the Oliveras/Universal relationship and the Commonwealth/Sheils relationship, Commonwealth contends that the *Oliveras* decision entitles it to judgment as a matter of law on Sheils's Law 75 claim.

We disagree with Commonwealth's statement of the holding of *Oliveras.* In that case, Oliveras, Inc. ("Oliveras") entered into a non-exclusive agency agreement with the Universal Insurance Company ("Universal"). *See id.* at 290, slip op. at 8. When Universal decided to cancel the agreement, Oliveras filed a complaint alleging arbitrary termination under Law 75, and breach of contract. *See id.* at 291, slip op. at 10. Ultimately, the trial court entered judgment in favor of Oliveras on the breach of contract cause of action in the amount of $1,093,106, and both parties appealed. *See id.* at 291, slip op. at 10–11. Before the Puerto Rico Supreme Court, Oliveras claimed that the court of first instance erred by not awarding it Law 75 damages. *See id.* at 291, slip op. at 11.

In *Oliveras,* the court did not hold that the Oliveras/Univeral relationship was not protected by Law 75. Rather, the court concluded that it did not need to make the determination whether Oliveras was entitled to Law 75 damages because

> [e]ven assuming, for argumentative purposes, that the contractual relationship that existed between Universal and Oliveras was protected by the aforecited Law 75, it is our criteria that the concession of damages to Oliveras is not pertinent: this because we understand that Universal had "just cause" to cancel the existing agreement.

*Oliveras,* 96 J.T.S. at 294–95, slip op. at 15. Because the *Oliveras* Court did not reach the question of the applicability of Law 75, its decision clearly does not compel a finding that the Commonwealth/Sheils relationship falls outside the scope of protection of Law 75.

Having said this, and mindful of the care that the *Oliveras* court took in assuming only argumentatively the applicability of Law 75, we find ourselves in the same position. As we shall explain, even assuming, without deciding, that the relationship of Sheils to Commonwealth is that of a "dealership," we conclude that Commonwealth had "just cause" to terminate the agency agreement.

**2. "Just Cause"**

Commonwealth next challenges the district court's denial of judgment as a matter of law with respect to Commonwealth's claim that "just cause" existed for its termination of the agency agreement. At the outset, it is important to note that Law 75 was not intended to prevent termination of unworkable relationships, but only to prevent arbitrary terminations. *See R.W. Int'l Corp. v. Welch Food, Inc.,* 13 F.3d 478, 485 (1st Cir.1994). Commonwealth asserts two grounds for its termination of the agency agreement, and argues that both grounds constitute "just cause" as a matter of law. *See supra* note 8.

Commonwealth first points to Sheils's performance during calendar years 1993

and 1994, which triggered the exercise of Commonwealth's rights under Paragraph 16(c)1 of the agency agreement. Under Paragraph 16(c)1, Commonwealth reserved the right to terminate the agreement, with ninety days written notice, if "[d]uring any calendar year . . . claims expense produced by the AGENT exceeds 25% of annual net premium remittance." At trial, Commonwealth presented evidence that the claims submitted to Commonwealth under policies issued by Sheils during calendar years 1993 and 1994 exceeded the amount of annual net premiums by 250%—more than ten times the percentage required to trigger Paragraph 16(c)1. Commonwealth argues that the issuance by Sheils of title insurance policies resulting in over $1.8 million in losses, constituted "just cause" for termination of Sheils as a Commonwealth agent.

■ Although "just cause" is typically a question of fact for the jury, see R.W. Int'l Corp. v. Welch Foods, Inc., 88 F.3d 49, 51 (1st Cir.1996), Sheils does not dispute the historical facts upon which Commonwealth bases its right to exercise the excessive claims provision. Nor does Sheils make the argument that Paragraph 16(c)1 was not an "essential obligation" of the dealer's contract. See P.R. Laws Ann. tit. 10, § 278(d). Rather, Sheils contends that Paragraph 16(c)1 should not apply because its language does not accurately reflect the way that the title insurance business is conducted in Puerto Rico. Specifically, Sheils argues that the "produced by" language of the excessive claims provision renders that provision inapplicable to Puerto Rico title insurance agents because in Puerto Rico title insurance agents do not "produce" claims.[11] With respect to the $1.8 million of claims submitted by Citibank to Commonwealth, Sheils makes the novel argument that those claims were "produced by" Bankers Finance, and, more specifically, by the misdeeds of its president, José Alegría—not by Sheils.

Sheils's argument, although imaginative, cannot prevail. Regardless of the way in which the title insurance business is conducted in Puerto Rico, see supra, note 11, we conclude that Commonwealth reasonably intended and understood the term "produced" to include within its scope all claims expenses resulting from policies issued by Sheils. We reach this conclusion after carefully considering the nature of the title insurance industry and the evidence presented at trial.

First, the reality of title insurance is that it insures failures to discover existing flaws or defects in title. As such, title insurance differs significantly from other types of insurance. Weigel explained this difference at trial:

A: Our business is a little bit different. More—most other kinds of insurance, the whole idea is they assume the risk. In our business we try to eliminate the risk or to avoid the risk.

Q: How is that possible?

A: It is possible when you take a look at the historical record of a title and search the title properly and make sure that the liens on the property are discharged and do all of the research necessary and file all of the proper documents, you eliminate the risk involved in a title insurance policy.

Q: How is that different [from] a life insurance company when it examines someone to issue a life insurance policy?

A: People make comparisons with a doctor's examination. If you think about examining the title as you do about examining the person, the differ-

11. Sheils argues that Paragraph 16(c)1 was written to account for the role played by stateside title insurance agents in real estate closings. In the states, title insurance agents attend real estate closings and disburse all of the loan proceeds. They cut the checks, cancel the prior mortgages, and prepare the nec-

essary documents. In contrast, in Puerto Rico, title insurance agents never attend real estate closings or disburse funds. Rather, the mortgage lender or bank controls the funds. Given this situation, Sheils disputes that the losses claimed by Citibank were "produced by" Sheils.

ence is if you examine the title and you do the job you are eliminating the possibility of anything bad happening. You are eliminating the possibility of a claim.

(Tr. 8/19/97 Afternoon Sess. at 31–32.) As Weigel explained, title insurance is unique in that it looks backwards, not forwards, and insures the validity and accuracy of an existing, historical document. This historical focus is a double-edged sword from the perspective of a title insurance agent. On the one hand, it renders agents entirely capable of eliminating risk of liability under the terms of a title insurance policy. On the other hand, it means that any claims expenses that result will, in most cases, be caused directly or indirectly by the agent. Commonwealth presented evidence at trial to this effect:

Q: Let me ask you a little bit about the difference or the elements that make our kind of insurance different. How would you compare our business in terms of the assumption of risk with other insurance business?

A: We're all insurance companies. We assume the risk in exchange for a premium, for an amount of money that we're paid to assume that. The agent in all cases is the person that can—is there to protect the company from, prevent losses. The example that I would say is that in an auto insurance company, for example, you're going to run a—check the driving record of the driver. If you find out that the driver has been arrested five times for drunk driving and crashed several times, you're not going to insure him . . . And it's the same way with title insurance.

Q: Yes, but in other types of insurance you can have the best driver in the world and you can—and he can have an accident and you can have the healthiest guy die. Is that our business, sir?

A: Yes. We have a risk, but again it's back to the agent. The agent is in

the position and in title insurance the primary thing that the agent must do is make sure that [the] prior mortgage has been canceled, it's been paid before they issue that new policy.

(Tr. 8/13/97 Morning Sess. at 28–29.) The undisputed testimony of both Smith and Weigel establishes that, because of the unique nature of the title insurance industry, title agents directly or indirectly cause most claims expenses. In light of this uncontested evidence, the intended meaning of the "produced by" term in Paragraph 16(c)1 is clear. We conclude that Commonwealth reasonably intended and expected the term "produced by" to include within the scope of Paragraph 16(c)1 all claims expenses resulting from policies issued by Sheils.

Sheils's second argument fares no better. Sheils argues that, assuming arguendo that the excessive claims provision is applicable to it as a Puerto Rico title insurance agent, Commonwealth failed to carry its burden under § 278a–1(c) to prove that the 25% provision was reasonable given the realities of the Puerto Rican market. Section 278a–1(c) states:

The violation or nonperformance by the dealer of any provision included in the dealer's contract fixing rules of conduct or distribution quotas or goals because it does not adjust to the realities of the Puerto Rican market at the time of the violation or nonperformance by the dealer shall not be deemed just cause. The burden of proof to show the reasonableness of the rule of conduct or of the quota or goal fixed shall rest on the principal or grantor.

P.R. Laws Ann. tit. 10, § 278a–1(c). In making this argument, however, Sheils ignores the evidence in the record that Commonwealth's other agents in Puerto Rico were able to maintain their claims expense at under 11% of their annual net remittances. At trial, Donald C. Weigel, President of northern operations for Commonwealth, specifically testified as to the

reasonableness of the 25% excessive claims provision in the Commonwealth/Sheils agreement:

Q. Tell us, according to the company numbers for the same period of time, what was the situation in Puerto Rico if you consider all of your agents except Sheils Title?

A: Without Sheils Title you will see that our claims experience there is 10.9%, which is below the national average, which means for the company it [Puerto Rico] is an attractive place to do business.

(Tr. 8/19/97 Afternoon Session at 29.) The testimony of Mr. Weigel to the effect that Commonwealth's other agents in Puerto Rico were able to maintain their claims expenses well under 25% is sufficient evidence of the reasonableness of the excessive claims provision to satisfy Commonwealth's burden under § 278a–1(c). Moreover, Sheils failed to come forward with any contradictory evidence on this point.

Again, the language of Paragraph 16(c)1 is clear and unambiguous: Commonwealth is entitled to terminate Sheils as its agent when, during any calendar year, the claims expense on policies issued by Sheils exceeds 25% of annual net premiums. The facts are not in dispute. The claims submitted to Commonwealth under Sheils-issued policies exceeded at least 250% of the net premiums in calendar years 1993 and 1994. After careful consideration of the record, we conclude that Commonwealth had "just cause", as a matter of law, to terminate Sheils as its agent.

Because we find that the excessive claims provision constituted "just cause" for termination of the Commonwealth/Sheils agency agreement, we need not reach Commonwealth's second ground for termination: the conflict of interest provision.

Our conclusion also renders moot Sheils's appeal from the district court's denial of its motion for a new trial on the issue of Law 75 damages. Sheils is no longer entitled to Law 75 damages, let alone a new trial.

## 3. Commonwealth's Counterclaim for Negligence

In response to Sheils's complaint alleging arbitrary termination in violation of Law 75, Commonwealth asserted a counterclaim against Sheils for recovery of the approximately $1.8 million it paid in claims as a result of Sheils's alleged negligence. Commonwealth's based its counterclaim on Paragraph 13(a) of the agency agreement, which provides that Sheils shall be liable to Commonwealth for "any loss, cost or expense ... sustained or incurred by [Commonwealth] and arising from the fraud, negligence or misconduct of [Sheils]." Commonwealth argued that Sheils was negligent in failing to assure that existing mortgages were in fact being discharged prior to insuring the priority of new mortgages.

To recover damages based on Sheils's negligence under Paragraph 13(a), Commonwealth was required to prove that: (1) Sheils owed a duty to Commonwealth to conform its conduct to a reasonable standard of care; (2) Sheils breached that duty; and (3) Sheils's breach caused Commonwealth harm. *See Tokio Marine & Fire Ins. Co., Ltd. v. Grove Mfg. Co.*, 958 F.2d 1169, 1171 (1st Cir.1992). At trial, Sheils did not dispute the first element of this cause of action; it acknowledged that as Commonwealth's title insurance agent it owed a duty to Commonwealth to ensure that prior liens were timely paid and canceled. Rather, Sheils disputed the second element: namely, that the steps it took and the procedures it implemented to fulfill this duty fell below a reasonable standard of care.

At the close of evidence, the jury returned a verdict against Commonwealth on its negligence counterclaim. After judgment was entered, Commonwealth moved for judgment as a matter of law, or, in the alternative for a new trial on its counter-

claim. The district court denied both motions, and Commonwealth now appeals.

■ Our review of a denial of judgment as a matter of law is severely circumscribed. *See Conway v. Electro Switch Corp.*, 825 F.2d 593, 598 (1st Cir.1987). We must sustain the district court's denial of a Fed.R.Civ.P. 50(b) motion, "unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment." *PH Group v. Birch*, 985 F.2d 649, 653 (1st Cir.1993).

■ On the other hand, we review denial of a motion for a new trial for abuse of discretion. *See id.* Under Fed.R.Civ.P. 59, a trial judge has ample power to set aside the verdict and grant a new trial if he or she is of the opinion that the verdict is against the clear weight of the evidence. *See Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.1982). In denying a motion for a new trial, there is no abuse of discretion unless "the verdict was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." *PH Group*, 985 F.2d at 653 (citations and quotations omitted). With these standards in mind, we examine the evidence presented at trial to determine whether Commonwealth's allegations of error are correct.

At trial, Sheils presented evidence that to fulfill its duty of care to Commonwealth it employed in-house attorneys and other personnel to perform spot checks of the payment and cancellation of prior liens. Michael Sheils explained the procedure utilized by the company:

> say we would close 100 cases in one month. Maybe we would check 20 of them and not check them all. It was impossible to check them all. We would send several investigators to the registry .... to make sure that the cancellation of Bank No. 2 canceling Bank No. 1's mortgage, we wanted to make sure that was canceled.

(Tr. 7/17/97 Morning Session at 75–76.) One of the attorneys employed to perform these spot checks, Robert Segarra, further testified that spot checking was the typical business practice of title insurance agents in Puerto Rico, and that his current employer, San Juan Abstract Company, utilized the same procedure.

With respect to the policies issued to Bankers Finance, Sheils also presented evidence of its efforts to obtain additional verification—beyond the spot checks—of the cancellation of prior mortgages. Specifically, Segarra testified that, pursuant to instructions from Michael Sheils, he wrote a letter dated June 30, 1993 to José Gómez Alegría, the attorney for Bankers Finance, requesting confirmation that Bankers Finance was performing timely cancellations. The Bankers Finance attorney responded, in writing, that cancellations were being performed diligently. In the letter, Gómez Alegría explained the procedure utilized by Bankers Finance to ensure timely cancellations: namely, that a messenger of Bankers Finance would hand-deliver a check in the amount of the outstanding lien to the prior lienholder. Gómez Alegría even extended a personal invitation to Segarra to visit the Bankers Finance offices to observe its procedures and to obtain further verification of the timely payment of prior liens.

Most significantly, several employees of Bankers Finance testified that the nonpayment of prior mortgages was top secret at Bankers Finance, and that only a small group of employees knew that Lourdes Ramos was concealing the cut checks in a Federal Express box in the top drawer of her desk pursuant to José Alegría's orders. There is no evidence in the record that Sheils was aware that these checks were not being forwarded to prior lienholders.

After hearing all of the evidence, the jury concluded that Sheils's spot-check procedures and its additional follow-up with Gómez Alegría satisfied its duty of care to Commonwealth to ensure that prior mortgages were timely discharged. We

cannot agree that this conclusion was unreasonable. We do not consider the jury's verdict "so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." *PH Group*, 985 F.2d at 653 (citations and quotations omitted). We, therefore, **affirm** the district court's denial of Commonwealth's motion for judgment as a matter of law and for a new trial with respect to its negligence counterclaim.

## CONCLUSION

For the reasons stated above, we **reverse** the district court's denial of judgment as a matter of law with respect to the existence of "just cause" for Commonwealth's termination of the agency agreement. However, we **affirm** the district court's denial of judgment as a matter of law with respect to Commonwealth's counterclaim for negligence.