<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1976

                   UNITED STATES OF AMERICA,

                           Appellee,

                               v.

                        JOSE E. ALEGRIA,

                     Defendant, Appellant.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Juan M. Prez-Gimnez, U.S. District Judge]

                                 

                             Before

                   Selya, Boudin and Lipez,
                                
                       Circuit Judges.
                                
                                
                                
    Alan M. Dershowitz, with whom Nathan Z. Dershowitz, Amy
Adelson, and Dershowitz & Eiger, P.C. were on brief, for appellant.
    Jorge E. Vega-Pacheco, Assistant United States Attorney, with
whom Guillermo Gil, United States Attorney, and Nelson Prez-Sosa,
Assistant United States Attorney, were on brief, for appellee.

September 30, 1999

                                

 SELYA, Circuit Judge.  This appeal requires us, inter
alia, to explore the circumstances in which the government may be
compelled to move for a downward departure under USSG 5K1.1.  We
conclude that the district court did not err either in refusing to
force the government to take such action or in any other material
respect.  Consequently, we affirm.
                               I
 A federal grand jury indicted defendant-appellant Jos E.
Alegra on sixteen counts of filing false statements with financial
institutions, 18 U.S.C.  1014, and bank fraud, 18 U.S.C.  1344.  
He entered into a plea agreement with the government (the
Agreement), pled guilty to all charges, and met twice with
government agents pursuant to a promise to cooperate.  We have no
detailed account of these debriefing sessions, but the appellant
states in a declaration (filed below in connection with his motion
for an evidentiary hearing) that he furnished the government with
whatever information he possessed concerning wrongdoing at the
financial institutions with which he was associated.
 Despite the appellant's cooperation, the prosecutor
elected not to file a downward departure motion.  The appellant
asserted that the prosecutor's decision contravened the Agreement
and, in the bargain, violated due process.  The sentencing court
rejected these animadversions, see United States v. Alegra, 3 F.
Supp. 2d 151 (D.P.R. 1998), denied the appellant's motion for an
evidentiary hearing, and proceeded to impose a 30-month
incarcerative sentence.  In this forum, the appellant continues to
press his claim that the government wrongly refused to file a
downward departure motion and embellishes it with a challenge to
the lower court's calculation of his guideline sentencing range.
                               II
 We start with the appellant's major premise:  that the
government obligated itself to file a downward departure motion by
virtue of promises it made during the negotiations that led up to
the execution of the Agreement and in the Agreement itself.  For
argument's sake, we take the facts from the appellant's
declaration.
 After the indictment was returned and the appellant
entered a "not guilty" plea, the parties began discussing the
possibility of a plea bargain.  In his declaration, the appellant
states that he had misgivings about whether the United States
Attorney's office would reward cooperation with a favorable
sentencing recommendation (he traces these misgivings to a previous
case in which the United States Attorney allegedly made similar
overtures to another bank executive, but subsequently reneged), and
therefore arranged to meet personally with Guillermo Gil, the
United States Attorney for the District of Puerto Rico, prior to
settling upon a course of action.  According to the appellant, Gil
assured him (in the presence of his then-counsel) that if he would
"tell the truth, be available, and cooperate," the government would
move for a departure under USSG 5K1.1 (permitting a sentencing
court to depart downward on the prosecution's motion, based on a
defendant's "substantial assistance").  The appellant asserts that
this specific representation persuaded him to sign the Agreement
and change his plea.  Hence, he asks that we hold the government to
Gil's word.
 As a general rule, nothing precludes a prosecutor from
bargaining away something over which he has discretion in return
for promises extracted from a criminal defendant.  See United
States v. Doe, 170 F.3d 223, 226 (1st Cir. 1999); United States v.
Hernandez, 17 F.3d 78, 82 (5th Cir. 1994).  Relatedly, a binding
prosecutorial representation that is accepted by a defendant and
becomes the basis for a change of plea must be performed.  See
Santobello v. New York, 404 U.S. 257, 262 (1971) (holding that
"when a plea rests in any significant degree on a promise or
agreement of the prosecutor, so that it can be said to be part of
the inducement or consideration, [the] promise must be fulfilled").  
In the appellant's view, these uncontroversial axioms carry the
day.
 But this conclusion depends entirely on the assumption
that what Gil allegedly said has legal force   and that assumption
stands on shaky ground because the Agreement, which purports to
encompass the sum and substance of the arrangement between the
parties, was signed after Gil allegedly made the crucial
representation and contains no reference to it.  The essential and
logically prior question, then, is whether the representation, even
if made, survives execution of the Agreement.
                               A
 Courts customarily treat plea agreements, for purposes of
construction, more or less in the same manner as they do contracts.  
See United States v. Atwood, 963 F.2d 476, 479 (1st Cir. 1992);
United States v. Anderson, 921 F.2d 335, 337-38 (1st Cir. 1990).  
We say "more or less" because this analogy has its limitations.  
See United States v. Hogan, 862 F.2d 386, 388 (1st Cir. 1988)
(observing that plea agreements are similar to commercial
contracts, but only "in certain respects").  Thus, although
contract law supplies a useful reference point for construing plea
agreements in federal criminal cases, such agreements are not
governed by the law of contracts.  See United States v. Kelly, 18
F.3d 612, 616 (8th Cir. 1994).
 If a plea agreement unambiguously resolves an issue, that
usually ends the judicial inquiry.  See id.; Anderson, 921 F.2d at
338.  If, however, a plea agreement lacks clarity or is manifestly
incomplete, the need to disambiguate may justify resort to
supplementary evidence or other interpretive aids.  See Anderson,
921 F.2d at 338.  We examine the text of the Agreement in light of
this dichotomy.
 The appellant calls our attention to paragraph 8 of the
Agreement, which embodies his pledge to "cooperate fully and
truthfully with the United States."  After spelling out the
elements of this cooperation   which include the typical assurances
that the appellant will remain available for debriefing, appear as
a witness, speak truthfully, provide documents, and so forth   the
paragraph explains that he is not expected to "make a case" against
anyone.  This is a shorthand way of saying that the government's
obligations under the Agreement are not conditioned upon the
achievement of any particular objective (e.g., the conviction of
some other person), but, in the language of the Agreement, "only
upon [Alegra] providing full, complete and truthful cooperation."  
The appellant maintains that this phraseology imports the United
States Attorney's oral representation into the Agreement.  We think
that this is a more ambitious reading of the passage than either
the text or the surrounding circumstances allow.
 USSG 5K1.1 provides the background understanding against
which the parties signed the Agreement and through which their
arguments must be filtered.  See United States v. Huang, 178 F.3d
184, 187-89 (3d Cir. 1999).  The appellant's construction
contemplates an equivalency between "full, complete and truthful
cooperation," on the one hand, and "substantial assistance," on the
other.  But the language and structure of section 5K1.1 belie the
idea that "full, complete and truthful cooperation" necessarily
constitutes "substantial assistance."  The guideline suggests five
non-exclusive factors that a court should consider when deciding
whether it will grant a prosecutor's motion for a downward
departure predicated on a defendant's substantial assistance.  See
USSG 5K1.1(a)(1)-(5).  Full, complete and truthful cooperation
corresponds to only one of these five factors.  See id.
5K1.1(a)(2).  The others include things well beyond the purview of
cooperation per se, such as the significance and utility of the
information provided, id. 5K1.1(a)(1), the nature and extent of
the defendant's assistance, id. 5K1.1(a)(3), and the timeliness of
the proffer, id. 5K1.1(a)(5).  In short, full, complete and
truthful cooperation, in and of itself, is not coextensive with the
substantial assistance of which the sentencing guidelines speak.
 In the case at bar, the Agreement, read as a whole,
plainly was meant to be understood in terms of the general approach
limned in section 5K1.1.  Although conditioned on the appellant's
conformance with paragraph 8, nothing in the text of the Agreement
suggests that the parties agreed either to collapsing the
substantial assistance determination into the relatively narrow
confines of paragraph 8 or to some other special definition of
substantial assistance.  This point is made pellucid by paragraph
11, which memorializes the appellant's express agreement that "the
United States' decision whether to file a motion based on
'substantial assistance' as that phrase is used in Rule 35(b) of
the Federal Rules of Criminal Procedure and Section 5K1.1 of the
Sentencing Guidelines and Policy Statements . . . rests in the sole
discretion of the United States," and further provides that
disputes about that decision will not be referred to the district
court.
 The obvious implication of this explicit reference to
section 5K1.1 is that the prosecutor will take into account all the
factors delineated in that guideline when determining whether to
move for a downward departure   and those factors, as we have
noted, go well beyond full, complete and truthful cooperation.  In
this way, the Agreement makes it quite clear that compliance with
the covenants contained in paragraph 8 constitutes a necessary, but
not an independently sufficient, precondition to the filing of a
section 5K1.1 motion.  Moreover, the reference in paragraph 11 to
Fed. R. Crim. P. 35(b) bolsters, rather than weakens, this
conclusion:  with regard to the meaning of "substantial
assistance," Rule 35(b) and USSG 5K1.1 are birds of a feather.  
See United States v. Gangi, 45 F.3d 28, 30 (2d Cir. 1995).
 The appellant's exhortation that our decision in Doe, 170
F.3d 223, points in a different direction is easily dispatched.  
Although the Doe court spoke of internal "tension" within the
contours of a plea agreement, that tension related to a completely
different problem:  the plea agreement purported to preserve the
government's absolute discretion in regard to section 5K1.1
motions, but at the same time stated that "the defendant's failure
to 'make a case' shall not relieve the government of exercising its
discretion" under section 5K1.1.  Id. at 226.  The government
decided not to file a downward departure motion because Doe's
assistance "came too late."  Id.  In that situation, we suggested
that the government's performance arguably conflicted with the
assurance contained in the plea agreement.  Concerned that the
government may have declined to file a section 5K1.1 motion because
Doe's help had come "too late" to permit it to "make a case"
against a third party, we found some tension between what the
government said it would do (i.e., not peg the substantial
assistance determination on whether Doe had made a case against
someone) and what it actually did.  See id.
 There is a critical difference between this case and Doe.  
The Agreement sub judice does not tie the government's exercise of
its section 5K1.1 discretion to whether the defendant has (or has
not) made a case against a third party, and thus does not contain
the language that caused the contretemps in Doe.  What is more, Doe
does not in any way intimate that the mere inclusion of a
cooperation clause in a plea agreement somehow circumscribes ex
proprio vigore the government's discretion anent the filing of such
motions.  Indeed, Doe never argued (as Alegra does) that
cooperation, if rendered, mandates the filing of a section 5K1.1
motion.
 We have said enough on this score.  The short of it is
that the concepts of "full, complete and truthful cooperation" and
"substantial assistance" are neither congruent nor interchangeable,
and the plain text of paragraph 11 refutes the appellant's
contention that the parties expressly modified this basic
understanding.  Consequently, the government's election not to file
a section 5K1.1 motion did not violate the stated terms of the
Agreement.

                               B
 The appellant has a fallback position.  He invites us to
supplement the Agreement by engrafting onto it the oral
representation allegedly made by the United States Attorney during
the pre-plea negotiations.  We decline the invitation.
 The appellant's position flies in the teeth of paragraph
22 of the Agreement, which states flatly that the written document
constitutes the complete agreement between the parties and that the
"United States has made no promises or representations except as
set forth in writing in this plea agreement and deny [sic] the
existence of any other terms and conditions not stated herein."  
Where, as here, an unambiguous plea agreement contains an
unqualified integration clause, it normally should be enforced
according to its tenor.  That means, of course, that an inquiring
court should construe the written document within its four corners,
"unfestooned with covenants the parties did not see fit to
mention."  Anderson, 921 F.2d at 338.
 In United States v. Burns, 160 F.3d 82, 83 (1st Cir.
1998), we decisively rejected a similar attempt by a defendant to
read into a written plea agreement an implied constraint on the
government.  Burns, in the course of appealing the district court's
enhancement of his sentence under a guideline provision, argued
that a clause in the plea agreement which restrained the government
from recommending such an increase "at sentencing" implied a duty
not to oppose Burns's effort to set aside the increase on appeal.  
See id. at 83.  We rejected this argument, explaining that the
government's promise simply did not go so far.  See id.  Moreover,
we admonished that "significant plea-agreement terms should be
stated explicitly and unambiguously."  Id.  Alegra, in effect,
asks us to ignore the obvious wisdom of the Burns court's
admonition and to read into the Agreement a representation that
nowhere appears in the text.  We are unwilling to freelance in this
fashion.  See id. (warning that the defense, like the prosecution,
"must be alert to the need for clear and explicit articulation of
all pertinent terms in any plea agreement").
 Two other considerations buttress the government's
position that the Agreement should be read as written.  In the
first place, soft-pedaling the integration clause and slipping an
antecedent oral promise into the text would render other of the
Agreement's relevant passages, such as paragraph 11, entirely
nugatory.  And this would contravene the rule that plea agreements,
like contracts generally, should be construed where possible to
give effect to every term and phrase.  See Feinberg v. Insurance
Co. of N. Am., 260 F.2d 523, 527 (1st Cir. 1958) ("In construing a
contract, we must give reasonable effect to all terms whenever
possible.").
 In the second place, inserting a new promise into the
Agreement would turn the change-of-plea colloquy into a farce.  At
that time, the district court placed the appellant (who was
assisted by counsel and does not question their effectiveness)
under oath and carefully questioned him.  See generally Fed. R.
Crim. P. 11(e).  The appellant assured the court that the
prosecution had made no promises to him apart from those that were
written explicitly into the Agreement.  Although Alegra's
appellate counsel tries to slough this off as a legal fiction and
admonishes us that all defendants prevaricate during change-of-plea
colloquies, courts cannot operate on the assumption that parties
feel free to lie with impunity in response to a judge's
interrogation.  We believe, therefore, that a defendant who asserts
a fact in answer to a judge's question during a change-of-plea
proceeding ought to be bound by that answer, absent exceptional
circumstances (say, for example, the emergence of newly discovered
evidence that places what was reasonably thought to be a fact in a
different light).  See, e.g., United States v. Doyle, 981 F.2d 591,
594 (1st Cir. 1992); United States v. Butt, 731 F.2d 75, 80 (1st
Cir. 1984).  We see no reason either to deviate today from this
salutary rule or to give the appellant the benefit of the long-odds
exception to it.
 The appellant attempts in several ways to denigrate the
effect of the integration clause and the other circumstances we
have mentioned.  Citing United States v. Rounsavall, 128 F.3d 665,
668-69 (8th Cir. 1997), he argues that oral representations
routinely are used to augment written plea agreements.  That case
(in which the precise wording of the plea agreement is never
discussed) simply does not stand for the proposition that prior
oral representations may trump unambiguous language in a plea
agreement that expressly purports to be integrated.  Moreover, the
same court elsewhere has indicated that it will rely on extrinsic
evidence only when, after considering a plea agreement as a whole,
the parties' intent remains ambiguous.  See Kelly, 18 F.3d at 616.
 The appellant also cites United States v. Leonard, 50
F.3d 1152 (2d Cir. 1995), for the same proposition.  The case makes
no such holding.  While the plea agreement there apparently
contained an integration clause, the only relevant issue before the
appellate court concerned a much different question:  the good
faith vel non of the government's decision not to move for a
downward departure.  See id. at 1157-58.  So, too, for obvious
reasons, we find inapposite the appellant's citations to a line of
cases in which courts have deemed terms outlined in transmittal
letters accompanying plea agreements to be part and parcel of those
agreements.  See, e.g., United States v. Garcia, 956 F.2d 41, 44
(4th Cir. 1992); United States v. Melton, 930 F.2d 1096, 1098-99
(5th Cir. 1991).
 When all is said and done, the Agreement's integration
clause   paragraph 22   withstands the appellant's bombardment.  
Accordingly, we hold that it is not reasonable for Alegra to seek
the benefit of a prior oral representation by the government after
he signed a fully integrated writing that did not contain the
claimed representation, and expressly affirmed to the district
court in the change-of-plea colloquy that he had not been
influenced by extrinsic representations of any kind.
                               C
 Although the plain language of the Agreement provides no
succor and the effort to supplement it fails, the appellant tries
an end run.  He posits that, in construing plea agreements, courts
should imply a duty of good faith in performance.  Thus, even
though a plea agreement states unambiguously   as this one does   
that the government retains absolute discretion with respect to the
filing of a section 5K1.1 motion, the accused is entitled to expect
that the government will honestly evaluate the appropriateness of
seeking a downward departure.  In his peroration, the appellant
asserts that the government thwarted this expectation and that the
district court erred by not holding an evidentiary hearing.
 This argument is not new.  United States v. Garcia, 698
F.2d 31 (1st Cir. 1983)   not cited to us by either the appellant
or the government   deals effectively with it.  That case arose
before the sentencing guidelines (and, hence, section 5K1.1) went
into effect.  It involved a written, fully integrated plea
agreement in which the government promised, in its discretion, to
make a lenient recommendation at sentencing if the defendant's
cooperation were complete and truthful.  See id. at 35 n.3.  We
concluded that allowing the government to retain absolute
discretion in these circumstances would "render a significant
element of the consideration for appellant's change of plea
illusory."  Id. at 36.  We lent substance to this element by
requiring the government "to show a good faith consideration of
[the defendant's] cooperation," that is, "to set forth in the
record sufficient reasons for its belief that [the defendant] has
not cooperated fully and that . . . a recommendation [of probation]
is not proper."  Id. at 35 (quoting decision below).
 To be sure, given the passage of time, the emergence of
the federal sentencing guidelines, and the Court's decision in Wade
v. United States, 504 U.S. 181 (1992), Garcia is arguably
distinguishable.  But we think that its central concept   that the
government must perform in good faith the discretionary obligations
that it affirmatively undertakes in a plea agreement   remains good
law.  Of course, this does not mean that courts can add material
conditions to plea agreements.  See, e.g., Garcia, 698 F.2d at 36
(emphatically eschewing such a course).  Nor does it mean that
every challenge to the government's good faith necessitates
protracted proceedings.  The government's burden of showing good
faith is only a burden of production, not of persuasion.  As long
as the government satisfies this modest burden, the trial court
need go no further unless the defendant makes a substantial
threshold showing that the government acted in bad faith.  See
Kelly, 18 F.3d at 618; United States v. Khan, 920 F.2d 1100, 1106
(2d Cir. 1990); cf. United States v. Catalucci, 36 F.3d 151, 154
(1st Cir. 1994).
 A myriad of practical, commonsense considerations
recommend this approach.  We mention five of them.  First, for a
court to inquire into the adequacy of a defendant's performance
under a plea agreement and assess the good faith of the
prosecutor's evaluation, it likely will need to delve into
sensitive matters   a course that ineluctably will have a
disruptive effect on the prosecutorial function.  Second, the
quantum of knowledge about ongoing investigations that is necessary
to make an informed decision often may be very high and the process
of acquiring that knowledge may be very time-consuming.  Third, an
uncontrolled good faith exception will provide criminal defendants,
after the fact, with virtual carte blanche.  Many of them, having
little to lose, will depict their performance glowingly, inviting
district courts to regard the prosecution's contrary statements as
pretextual (thus prompting further inquiry).  We doubt that a
proliferation of such collateral litigation would square either
with the Supreme Court's decision in Wade, 504 U.S. at 185-87, or
with the orderly administration of the criminal justice system.  
Fourth, recognizing a duty of good faith on the prosecutor's part
creates possibilities for opportunism in a manner that threatens to
countermand the goals of the criminal law   and these possibilities
multiply as the ground rules for such challenges become more lax.  
We made this point emphatically in Doe, when we explained that
"[d]efendants, asked for information to incriminate others, have
good reasons to fear for their safety and, unless the prosecutor
holds the whip hand, the defendant may offer up some information
and hold back the more vital balance in the hope that the court
will find the government 'unreasonable' and infer 'bad faith.'"  
Doe, 170 F.3d at 225.  Thus, diminishing the bite of the whip
through overzealous enforcement of the duty of good faith would be
counterproductive.  Finally, the path that we have mapped out
comports with our oft-stated belief that, in criminal cases,
evidentiary hearings should be the exception, not the rule:
   We have repeatedly stated that, even in the
 criminal context, a defendant is not entitled
 as of right to an evidentiary hearing on a
 pretrial or posttrial motion.  Thus, a party
 seeking an evidentiary hearing must carry a
 fairly heavy burden of demonstrating a need
 for special treatment.
                                                                 
United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993)
(citations omitted); accord United States v. Isom, 85 F.3d 831, 838
(1st Cir. 1996).
 In this case, the pertinent portion of the plea agreement
is the government promise to consider whether the appellant had
rendered substantial assistance, and, thus, merited a section 5K1.1
motion.  See supra Parts II(A)-(B).  This commitment carried with
it an obligation to evaluate the appellant's assistance in good
faith (although the "sole discretion" language in which the promise
was couched informed the nature of the obligation).  The government
proffered facially adequate reasons for its conclusion that the
appellant had failed to achieve the substantial assistance
benchmark:  the supplied information was "[on] occasions . . .
hearsay and on others . . . just too meager," and also included
"self-serving rationalizations" (a characterization that the
government punctuated with a telling example).  This rejoinder
satisfied the government's burden of production.  Taken at face
value, the appellant's counter-proffer showed that he attended two
debriefing sessions with FBI agents and that he was responsive and
truthful.  He described in some detail information that he gave
regarding alleged kickbacks received by a certain bank officer, and
referred the government agents to a company that had been
transferring large sums of money between Puerto Rico and the
Dominican Republic under suspicious circumstances.
 We do not believe that the district court erred in
deeming this proffer insufficient to warrant further proceedings.  
Although the appellant professes to be sanguine about the value of
the information that he furnished, the record contains no
indication that any of it was useful to the government.  By like
token, the appellant wholly fails to explain how this information
relates to any ongoing criminal investigation.  The lower court
therefore lacked any kind of reliable framework within which it
could even begin to assess whether this "assistance" helped the
government to any degree, let alone whether it proved
"substantial."
 In a last gasp, the appellant calumnizes the government's
failure to respond to information contained in a supplementary
letter that he transmitted.  We need not linger over this
correspondence.  The appellant again fails to show how that
information was any more useful than the material cited in his
declaration.  In addition, we explained in Doe that the
government's failure to pursue such information, without more,
amounts at most to carelessness and does not suffice to make out a
case of bad faith.  See Doe, 170 F.3d at 225-26.
 To say more on this point would be supererogatory.  We
review the district court's decision as to whether to go further,
that is, whether to convene an evidentiary hearing on the issue of
the government's good faith, for abuse of discretion.  See David v.
United States, 134 F.3d 470, 477 (1st Cir. 1998).  Stripped of
rhetorical flourishes, the appellant offers a wealth of conclusory
assertions, but no persuasive evidence of either substantial
assistance or bad faith.  On this gossamer record, we cannot
conclude that the sentencing court abused its discretion in ruling
that the appellant failed to attain the requisite threshold.  It
follows inexorably that the government did not breach the duty of
good faith in performance that due process imposes.
                               D
 The appellant's final departure-related argument is that,
if the absence of a government motion places section 5K1.1 beyond
his reach, the district court, given his cooperation, nonetheless
should have departed downward under the general departure
guideline, USSG 5K2.0.  See generally Koon v. United States, 518
U.S. 81, 94-95 (1996) (discussing the circumstances in which
departures under 5K2.0 are proper); United States v. Dethlefs, 123
F.3d 39, 44 (1st Cir. 1997) (same).  We need not linger over this
importuning.  The three courts of appeals that have addressed the
question since Koon agree that section 5K1.1 occupies the field and
that departures for substantial assistance, however labeled, are
available only under section 5K1.1.  See In re Sealed Case, 181
F.3d 128, 140-42 (D.C. Cir. 1999); United States v. Solis, 169 F.3d
224, 227 (5th Cir. 1999), petition for cert. filed, ___ U.S.L.W.
___ (U.S. June 3, 1999) (No. 98-9623); United States v. Abuhouran,
161 F.3d 206, 213 (3d Cir. 1998), cert. denied, 119 S. Ct. 1479
(1999).
 We had left the question open in a pre-Koon case.  See
United States v. Romolo, 937 F.2d 20, 25 (1st Cir. 1991).  We now
answer it, adopt the reasoning of our sister circuits, and hold
that a defendant's assistance to the prosecutor cannot serve as the
basis for a section 5K2.0 departure.  By necessary implication,
then, the district court did not err in refusing to depart downward
based on Alegra's cooperation.
                              III
 We turn last to the calculations underpinning the
appellant's sentence.  For economic crimes like bank fraud, amount
of loss is a critical component in formulating the guideline
sentencing range.  See, e.g., United States v. Rostoff, 53 F.3d
398, 407-08 (1st Cir. 1995); United States v. Tardiff, 969 F.2d
1283, 1285 (1st Cir. 1992).  The appellant claims that the district
court erred in calculating the pecuniary losses caused by his
conduct.  Because this challenge cannot be divorced from the facts,
we sketch the contours of the offenses of conviction.  As is the
custom in sentencing appeals, we draw our factual insights from the
change-of-plea colloquy, the presentence investigation report, and
the transcript of the disposition hearing.  See, e.g., United
States v. Dietz, 950 F.2d 50, 51 (1st Cir. 1991).  In this case,
moreover, we also have the benefit of our opinion in related
litigation.  See Sheils Title Co. v. Commonwealth Land Title Ins.
Co., 184 F.3d 10 (1st Cir. 1999).
 The appellant served as the president of Bankers Finance
Mortgage Corporation (BFMC).  In the ordinary course of its
business, BFMC made residential mortgage loans.  Many of these
loans were refinancings.  In such a refinancing, BFMC's business
plan called for it to pay off the borrower's existing first
mortgage and make a new loan secured by a new first mortgage.  It
then bundled groups of these loans and peddled the packages to
large financial institutions (most prominently, Citibank), in each
case representing that the purchaser would receive the functional
equivalent of a first mortgage, viz., an assignment of BFMC's first
mortgage.  When a loan was sold, BFMC would send the purchaser an
assignment and a certificate of title insurance.  Simultaneously,
BFMC would notify the borrower to make future payments directly to
the purchaser.  The purchaser would then pay the agreed purchase
price to BFMC.
 The major snag in this scenario was that, in certain
instances, BFMC never paid off the original mortgages.  Thus, the
purchasers held second rather than first mortgages.  Moreover, the
mortgagors went into default on the original mortgages,
notwithstanding their payments to the purchasers.  BFMC's chicanery
came to light when some of the original lenders initiated
foreclosure actions.  The purchasing institutions were in many
instances left holding an empty bag.
 The indictment focused on BFMC's transactions with
Citibank, which lost approximately $3,100,000 as a result of the
scheme.  Citibank managed to recoup some two-thirds of this amount
from BFMC and the appellant, reducing its net loss to roughly
$1,200,000.  This amount was reimbursed by the title insurer.  See
Sheils, 184 F.3d at 12-13 (describing scheme and recounting details
of title insurer's involvement).
 Against this mise-en-scene, the district court concluded
that the essence of the criminal conduct more closely resembled
theft than simple fraud (in that the appellant took value from
Citibank without intending to give anything of value in return).  
See United States v. Orton, 73 F.3d 331, 334 (11th Cir. 1996)
(explaining difference between theft and simple fraud); United
States v. Smith, 951 F.2d 1164, 1167 (10th Cir. 1991) (similar);
United States v. Kopp, 951 F.2d 521, 528-29 (3d Cir. 1991)
(similar); see also United States v. Flowers, 55 F.3d 218 (6th Cir.
1995) (declining to treat check-kiting cases like fraudulent loan
application cases); United States v. Frydenlund, 990 F.2d 822, 825-
26 (5th Cir. 1993) (similar); cf. United States v. Schneider, 930
F.2d 555, 558 (7th Cir. 1991) (distinguishing between fraud in
which the fraudfeasor intends to deprive the victim of the entire
value of an object and fraud in which the fraudfeasor returns
something of value to the victim).  Having reached this conclusion,
the court ignored the title insurer's payments and fixed the amount
of loss attributable to the scheme at $1,200,000.  See USSG
2F1.1(b).  This, in turn, dictated the guideline sentencing range
and influenced the length of the prison sentence that the court
imposed.
 We review sentencing determinations under a bifurcated
standard.  Quintessentially legal questions, including
determinations as to the meaning and application of particular
guidelines, engender de novo review.  See United States v. St. Cyr,
977 F.2d 698, 701 (1st Cir. 1992).  The sentencing court's
factfinding, however, is reviewed deferentially and will be
disturbed only if it is shown to be clearly erroneous.  See id.  We
assume here, favorably to the appellant, that the de novo standard
of review obtains.
 The appellant's principal objection to the district
court's loss calculation is that it failed to take into account the
fact that Citibank, because it enjoyed the benefit of title
insurance, never ran a risk of losing anything on the mortgage
transactions.  In the appellant's view, the title insurance
functioned essentially as pledged assets, see USSG 2F1.1, comment.
(n.8(b)); the transactions between BFMC and Citibank thus were
equivalent to fraudulent loan transactions, see id.; and,
therefore, any amounts recovered by Citibank from the title insurer
must be offset in computing the amount of loss.
 Although the parties debate longiloquently the question
of whether the appellant's conduct was tantamount to a series of
fraudulent loan transactions, we need not force our way into
Procrustean taxonomies to resolve the underlying dispute.  Cf.
United States v. Riley, 143 F.3d 1289, 1291-92 (9th Cir. 1998)
(endorsing economic reality approach to sentencing).  Even assuming
that this scheme is best characterized as involving fraudulent
loans, we find no error in the court's decision not to shrink the
amount of loss to reflect the receipt of title insurance proceeds.  
Insurance, unlike pledged assets, does not diminish the impact of
the fraud.  Rather, insurance simply shifts the loss to another
victim (the insurance company), so it is irrelevant in calculating
the amount of loss for sentencing purposes.  See United States v.
Daniels, 148 F.3d 1260, 1262 (11th Cir. 1998) (per curiam).
 We need go no further.  There is no question but that
the appellant engaged in willful misconduct.  The mere fact that
his victim was insured puts him in a worse, not a better, position
from the standpoint of the criminal law:  he not only committed
fraud, but his knowledge that Citibank had title insurance
permitted him to gamble with other people's money.  It would be
perverse to hold that criminals need not account for fraudulent
losses because they know that, regardless of their machinations,
their principal victim will be made whole by an insurance company.  
The sentencing guidelines surely do not compel such a conclusion.

Affirmed.

</body>

</html>